Sarah Jane Fischer, Bar No. 260807
sarahfischer@perkinscoie.com
PERKINS COIE LLP
1029 West Third Ave., Suite 300
Anchorage, Alaska 99501
Telephone: 907.279.8561
Facsimile: 907.263.6427

Attorneys for Defendant
AHTNA TECHNICAL SERVICES, INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE GALVAN,<br><br>                Plaintiff,<br><br>    v.<br><br>ASSET PROTECTION & SECURITY SERVICES, LP; AHTNA TECHNICAL SERVICES, INC.; and DOES 1-45,<br><br>                Defendants. | Case No. '13CV2283 H    DHB<br><br>**DEFENDANT AHTNA TECHNICAL SERVICES, INC. NOTICE OF REMOVAL OF CIVIL ACTION TO FEDERAL COURT**<br><br>[28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446]<br><br>Complaint filed:   July 1, 2013<br>[originally filed in Imperial County Superior Court] |

PLEASE TAKE NOTICE that pursuant to 28 U.S.C. §§ 1441 and 1446, defendant Ahtna Technical Services, Inc. ("ATSI") hereby removes Case No. ECU07733, entitled *Jose Galvan v. Asset Protection & Security Services, LP, Ahtna Technical Services, Inc., and Does 1-45*, from the Superior Court for the State of California, County of Imperial, El Centro Division, to the United States District Court, Southern District of California. The removal is based on 28 U.S.C. §§ 1331, 1332, 1367, 1441, 1446 and, specifically, on the following grounds:

## I.   GROUNDS FOR REMOVAL AND JURISDICTION

1.      The court has original jurisdiction of this action pursuant to 28 U.S.C. § 1332, which provides "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between citizens of different states . . ."

a.      The parties are citizens of different states.  Plaintiff is a citizen of California.  Pursuant to 28 U.S.C. § 1332(1), ATSI is deemed a citizen of Alaska because (1) it is incorporated in Alaska, and (2) its principal place of business is in Anchorage, Alaska.  ATSI's principal place of business is in Alaska because its corporate "nerve center" is in Anchorage, Alaska. *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1192 (2010).  ATSI's corporate headquarters are located in Anchorage, Alaska and this is where ATSI's corporate officers "direct, control and coordinate [ATSI's] activities." *Id.*  Accordingly, ATSI is only a citizen of the State of Alaska.

b.      Pursuant to 28 U.S.C. § 1332(1), Asset Protection & Security Services, LP ("Asset") is deemed a citizen of Texas because (1) it is incorporated in Texas, and (2) its principal place of business is in Corpus Christi, Texas.  Plaintiff acknowledges that Asset is a citizen of the State of Texas and correctly aver in their complaint that Asset is a Texas-based corporation. *See* Complaint ¶ 2.  They also allege that APSS is a Texas organization.  Moreover, Asset's principal place of business is in Texas because its corporate "nerve center" is in Corpus Christi, Texas. *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1192 (2010).  Asset's  corporate headquarters are located in Corpus Christi, Texas and this is where Asset's corporate officers "direct, control and coordinate [Asset's] activities." *Id.*  Accordingly, Asset is only a citizen of the State of Texas.

c.      As set forth below, the amount placed into controversy by the complaint exceeds the sum or value of $75,000.  Plaintiff's complaint alleges that as of June 1, 2013, his lost wages were "$60,000 and continuing."  Complaint ¶ 47.  In addition to his lost wages, Plaintiff also seeks emotional distress damages, lost benefits, bonuses, vacation benefits, and attorney's

fees.  Complaint ¶ 49; pp. 27-29.  ATSI understands and believes that, when combined, Plaintiff's alleged damages are in excess of $75,000.  *See Simmons v. PCR Technology*, 209 F. Supp. 2d 1029, 1031 (N.D. Cal. 2002) (held that lost wages of $56,000 by the date of trial coupled with other damages, i.e., medical expenses, emotional distress damages, and attorney's fees, met burden to show amount in controversy exceeded $75,000).

2.      This Court has original jurisdiction of this action pursuant to the provisions of 28 U.S.C. § 1331 and Section 301 of the Labor Management Relations Act.  Section 301 provides that "[s]uits for violation of contracts between an employer and a labor organization representing employees . . . may be brought in any district court of the United States . . ." 29 U.S.C. § 185.

a.      Plaintiffs' Complaint alleges defendants breached duties and obligations provided in the parties' Collective Bargaining Agreement ("CBA").  Plaintiffs' allegations concerning employee handbooks and  progressive discipline are allegations concerning the CBA. Accordingly, Plaintiffs' claims, as well as Defendant's defenses, necessarily require interpretation of the CBA.  A copy of the CBA is attached hereto as Exhibit A.

b.      Application of state law is preempted and federal labor law principles must be employed to resolve the dispute because resolution of Plaintiffs' claims depends upon the meaning of the CBA.  *See Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405-06 (1988).

3.      Additionally, this Court has original jurisdiction of this action pursuant to the provisions of 28 U.S.C. § 1331, which provides that this court "shall have original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."  Plaintiff's complaint includes a claim under the Family Medical Leave Act, 29 U.S.C. § 2601.  Complaint at 24-26. This is a federal statutory claim.  Accordingly, this Court has original jurisdiction over Plaintiff's complaint.

4.      Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this Court because a substantial part of the events alleged in Plaintiff's complaint occurred in the Southern District of California. *See* 28 U.S.C. §§ 84(c)(2), 1391 and 1446.

**II.    PLEADINGS AND PROCEEDINGS TO DATE.**

5.      On or about June 27, 2013, Plaintiff Jose Galvan filed a Verified Complaint in the Superior Court, County of Imperial, El Centro Division, bearing the caption, *Jose Galvan v. Asset Protection & Security Services, LP, Ahtna Technical Services, Inc., and Does 1-45*, Case No. ECU07733. A copy of the summons and complaint (including exhibits), is attached hereto as Exhibit B.

6.      On September 23, 2013, Defendant ATSI filed an Answer to Plaintiff's Verified Complaint. Attached hereto as Exhibit C is a true and correct copy of the Answer.

7.      No further proceedings have been conducted in this case in the Imperial County Superior Court.

8.      All pleadings, process or orders received by ATSI in the case are attached hereto. Defendants have not received other process, pleadings or orders. 28 U.S.C. § 1446(a).

**III.   DEFENDANTS' NOTICE OF REMOVAL IS TIMELY.**

9.      Plaintiff served ATSI on August 23, 2013. Therefore, this Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b) because ATSI filed this Notice within 30 days after receiving the pleadings from which it could first determine that this action was removable and less than one year after commencement of this action as required under 28 U.S.C. § 1446(b).

**IV.    CONSENT BY DEFENDANT ASSET.**

10.     Defendant Asset has not entered an appearance in this case and on information and belief, Asset has not been properly served. Pursuant to 28 U.S.C. § 1446(b)(2)(A), only defendants who have been "properly served" must consent to removal. Here, since Asset has not been properly served, consent is not required.

**V.     NOTICE TO STATE COURT AND PLAINTIFF'S COUNSEL**

11.     Contemporaneously with the filing of this Notice of Removal in the United States District Court for the Southern District of California, written notice of the removal will be given

1   by the undersigned to counsel for Plaintiff and a copy of this Notice of Removal will be filed with

2   the Clerk of the Imperial County Superior Court, California as required by 28 U.S.C. § 1446(d).

3

4   DATED:  September 23, 2013                     **PERKINS COIE** LLP

5

6                                                   By:/s/-*Sarah Jane Fischer*
                                                        Sarah Jane Fischer, Bar No. 260807
7                                                       sarahfischer@perkinscoie.com

8                                                   Attorneys for Defendant
                                                    AHTNA TECHNICAL SERVICES, INC.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE BY MAIL

2

3   I am a citizen of the United States and employed in Anchorage, Alaska.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 1029 West Third Ave., Suite 300, Anchorage, Alaska  99501.  On September 23, 2013, I sent via U.S. Mail a true and correct copy of the foregoing document to:

4

5   Adrian Cress
Cress Law Firm
6   2425 Fifth Avenue, Suite 330
San Diego, California  92101
7   *Attorney for Plaintiff*

8   I declare under penalty of perjury under the laws of the State of Alaska that the above is true and correct.

9

10   Executed on September 23, 2013, at Anchorage, Alaska.

11

12   Marcie Craig

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**Collective Bargaining Agreement**

**Between**

**Asset Protection & Security Services, LP,
And its subcontractor:
Ahtna Technical Services, Inc.
and**

**International Union, Security, Police and Fire Professionals of America (SPFPA)
Amalgamated Local # 165**

**Effective January 1, 2010**

1

**Exhibit A
Page 1**



## TABLE OF CONTENTS
### By Article

| Article | Title | Page |
|---|---|---|
| | Preamble | 3 |
| Article 1 | General Provisions | 3 |
| Article 2 | Seniority | 5 |
| Article 3 | Job Opportunities | 7 |
| Article 4 | Management Retained Rights | 8 |
| Article 5 | Grievance Procedure | 8 |
| Article 6 | Discipline | 10 |
| Article 7 | Hours of Work and Overtime | 11 |
| Article 8 | Work Shifts and Payment Policies | 13 |
| Article 9 | Holidays | 15 |
| Article 10 | Vacations | 16 |
| Article 11 | Leaves of Absence | 17 |
| Article 12 | Health, Welfare and Uniform Allowances | 20 |
| Article 13 | Miscellaneous Provisions | 21 |
| Article 14 | 401(k) Plan | 24 |
| Article 15 | Safety | 25 |
| Article 16 | Continuity of Operations | 25 |
| Article 17 | Separability of Contract | 25 |
| Article 18 | Entire Agreement | 25 |
| Article 19 | Duration | 26 |
| Appendix A | Wage Information | 27 |



## TABLE OF CONTENTS
### Alphabetically

| Article | Title | Page |
|---|---|---|
| Article 16 | Continuity of Operations | 25 |
| Article 6 | Discipline | 10 |
| Article 19 | Duration | 26 |
| Article 18 | Entire Agreement | 25 |
| Article 14 | 401(k) Plan | 24 |
| Article 1 | General Provisions | 3 |
| Article 5 | Grievance Procedure | 8 |
| Article 12 | Health, Welfare and Uniform Allowances | 20 |
| Article 9 | Holidays | 15 |
| Article 7 | Hours of Work and Overtime | 11 |
| Article 3 | Job Opportunities | 7 |
| Article 11 | Leaves of Absence | 17 |
| Article 4 | Management Retained Rights | 8 |
| Article 13 | Miscellaneous Provisions | 21 |
| | Preamble | 3 |
| Article 15 | Safety | 25 |
| Article 2 | Seniority | 5 |
| Article 17 | Separability of Contract | 25 |
| Article 10 | Vacations | 16 |
| Appendix A | Wage Information | 27 |
| Article 8 | Work Shifts and Payment Policies | 13 |



## PREAMBLE

THIS AGREEMENT is made and entered by and between Asset Protection & Security Services, LP, a Texas Limited Partnership, Ahtna Technical Services, Inc., an Alaska Native Corporation (hereinafter collectively referred to as the "Company" and/or "Employer" and International Union, Security, Police and Fire Professionals of America (SPFPA), on behalf of its Local #165 (hereinafter referred to as the "Union").

## ARTICLE 1

## GENERAL PROVISIONS

### SECTION 1.1  BARGAINING UNIT

This agreement is entered into between the Company and the Union.  The Company recognizes the Union as the sole and exclusive bargaining representative for the purpose of collective bargaining as defined in the National Labor Relations Act.

The Unit is defined as all full-time and part-time position Custody Officers employed by the Company at the ICE Service Processing Center, El Centro, California, excluding all other Employees including office clerical Employees and professional Employees as defined in the National Labor Relations Act.

The Bargaining Unit is expanded to include those officers designated as Armed Transport Officers and those officers whose post assignments include duties associated with bearing a firearm.

This agreement shall be binding upon both parties, their successors and assignees.  In the event of a sale or transfer of the business of the employer, or any part thereof, the purchaser or transferee shall be bound by this agreement.



### SECTION 1.2  NEGOTIATING COMMITTEE

The Company agrees to recognize a Negotiating Committee composed of up to four (4) members and one (1) alternate selected by the Union to represent the Employees in collective bargaining negotiations.

### SECTION 1.3  STEWARD SYSTEM

A.     The Company agrees to recognize a steward system.

B.     The Union agrees that the stewards will work at their regular jobs at all times except when they are relieved to attend to the business of the Grievance Procedure as outlined in this Agreement. Aggrieved Employees will be paid their regular rate of pay in the conduct of Company-Union business during scheduled working hours.

C.     If the Employee requests, the Company will call for a steward prior to any disciplinary action taken, whether it be written or verbal.  The supervisor will release the steward as soon as possible.  The Union Steward will be paid for time spent in the regard, upon receiving Supervisor approval of relief from duty.

D.     It is agreed that Union Committee Members may, from time to time, be allowed to deliver documents to Members at the work site, under the stipulation that it does not interfere with the orderly operations of the facility or interfere with duties scheduled by Company Management. Such delivery of documents will only be conducted during authorized times and places as set forth by Company Management.

### SECTION 1.4  MANAGERS AND SALARIED PERSONNEL



Managerial and salaried Employees shall not perform duties of the Employees in the bargaining unit, except in an emergency.

3

Exhibit A
Page 3

### SECTION 1.5  CLASSIFICATIONS



A.   Full-time Employees are those Employees who are scheduled to work 40 hours per week and regularly work 32 hours or more a week.

B.   Part-time Employees are those Employees who are scheduled to regularly work less than 32 hours per week.

C.   Employees covered by this agreement shall not be required to deliver office supplies, furniture, equipment, or distribution that does not pertain to Custody/Security related duties.

D.   Employees covered by this agreement shall not be required to perform janitorial service other than to clean up or pick up after themselves; except that Transport Officers may be assigned to regularly clean and sanitize the interior of transport vehicles and wash vehicles when necessary; to this end the company will arrange for the issue of coveralls and equipment necessary to meet vehicle cleanliness requirements at no cost to employees.

### SECTION 1.6  UNION SECURITY

A.   An Employee who is a member of the Union at the time this Agreement becomes effective shall continue membership in the Union for the duration of this Agreement, to the extent of tendering the membership dues uniformly required as a condition of retaining membership in the Union.

B.   An Employee who is not a member of this Union at the time that this Agreement becomes effective shall, within 10 days after the 30th day following the effective date of this Agreement or date of hire, either:



   1.   Become a member of the Union and remain a member.

   2.   Pay the Union a service fee.  The amount of this service fee shall be equal to that paid by regular Union members to include regular and usual initiation fees.  The service fee will not include any assessments, special or otherwise.  Such payments shall commence on the 30th day after the date of hire.

      a)   Employees who are members of, and adhere to the established and traditional tenets of a bona-fide religion, body, or sect, which has historically held conscientious objections to joining or financially supporting labor organizations, shall, instead of the above, be allowed to make payments in amounts equal to the agency fee required above, to a tax-exempt organization (under Section 501(c)(3) of the IRS Code).

      b)   The Union shall have the right to charge any Employee exercising this option, the reasonable cost of using the arbitration procedure of this Agreement on the Employee's individual behalf.  Further, any Employee who exercises this option shall twice a year submit to the Union proof that the charitable contributions have been made.

C.   The obligations set forth in this Article shall only be effective to the extent permitted by controlling law, including, but not limited to, any Executive Orders permitting or restricting Union security rights.  If there is a legal challenge to any provision of this Article, the Employer may suspend its obligations under this Article for the duration of the dispute after conferring on the matter with the Union.

D.   The Union, including its International, agrees to save and hold the Employer harmless from any and all claims on account of any matter relating to the terms of this Article, including, but not limited to, any claims by any Employee(s) and compliance with the law.

### SECTION 1.7  DUES CHECKOFF



A.   The Company agrees to deduct dues as designated by the Union on a monthly basis from paycheck of each member of the Union.  These deductions will be made only upon written authorization from the Employee

4



on a form provided by the Union. It is understood that such deductions will be made only so long as the Company may legally do so. The Company will be advised in writing, by the Union, as to the dollar amount of the Union membership dues.

B.    The Company will remit all such deductions to the Financial Secretary/Treasurer within five (5) business days from the date that the deduction was made, via direct deposit, if possible. All costs related to direct deposit will be borne by the Union. The Union agrees to furnish the Company with the current routing number for direct deposit. The Company shall furnish the Financial Secretary/Treasurer with a deduction list, setting forth the name, address, date of hire, and amount of dues, within seven (7) business days of each remittance. The Union agrees to indemnify and hold the Company harmless from any action or actions growing out of these deductions initiated by an Employee against the Company, and assumes full responsibility of the dispositions of the funds so deducted, once they are paid over to the Union. Errors made by the Company in the deduction or remittance of monies shall not be considered by the Union as a violation of this provision, providing such errors are unintentional and corrected when brought to the Company's attention.

## SECTION 1.8  INTENT OF PARTIES

The Union and the Company agree to work sincerely and wholeheartedly to the end that the provisions of this Agreement will be applied and interpreted fairly, conscientiously, and in the best interest of efficient security operations. The Union and the Company agree to use their best efforts to cause the Bargaining Unit Employees, individually and collectively, to perform and render loyal and efficient work and services on behalf of the Company.



Neither the Company, nor the Union, nor their representatives, nor their members will intimidate, coerce, or discriminate in any manner against any person in its employ by reason of his/her membership and activity or non-membership or non-activity in the Union.

It is expressly understood and agreed that the services to be performed by the Employees covered by this Agreement pertain to and are essential to the operation of the El Centro Service Processing Center. Both the Company and the Union recognize their paramount goal is to maintain safety and provide continuity of facility operations at the El Centro Service Processing Center.

## SECTION 1.9  ANTI-DISCRIMINATION

Neither the Company nor the Union will discriminate against any Employee because of race, color, religion, sex, age, national origin, Vietnam Era Veterans status, disability, or other protected reason. The Employer will treat Employees with dignity and respect at all times. Employees will also treat each other as well as the Employer with dignity and respect. The Company and the Union recognize that the objective of providing equal employment opportunities for all people is consistent with Company and Union philosophy, and the parties agree to work sincerely and wholeheartedly toward the accomplishment of this objective.

## ARTICLE 2

## SENIORITY

## SECTION 2.1  SENIORITY DEFINED

For the purpose of this Agreement, "Special Details" are those that are assigned for an extended period of time and do not change day to day.



A.    Union seniority shall be the length of continuous service from the Employee's last date of hire as Custody Officer for the Employer, past or present and/or any predecessor Employer. Seniority shall not accrue until the Employee has successfully completed the probationary period. Seniority shall be applicable in determining the

5



order of layoff and recall, shift bidding, special details, vacation schedules, extra work, transfers, and other matters as provided for in this Agreement.

B.   For the purposes of shift bidding, special details, vacation schedules, transfers, days off, and extra work, union seniority shall be defined as seniority within the work site.

C.   Any Employee permanently transferred out of the designated Local Bargaining Unit for any reason shall lose their Union seniority as it applies to the order of layoff and recall, shift bidding, special details, vacation schedules, extra work, and other matters as provided for in this agreement.

D.   Part-time Employees will have seniority only among other part-time Employees. Any part-time Employee who becomes full-time will be placed on the seniority list for full-time Employees in accordance with the date they become a full-time Employee or once they have completed the equivalent of the 90 day probationary period.

E.   Employees who make Company approved transfers will maintain Company security based on original hire date after the approved transfer.

## SECTION 2.2   SENIORITY LISTS

The Company will provide a list to the Local twice a year on demand of the Union. The data will include name, location, classification, rate of pay, and last Entry on Duty date. The Union will verify seniority and provide a copy of the confirmed seniority list to the Company within 14 days of receipt.

## SECTION 2.3   PERSONAL DATA



Employees shall notify the Employer in writing, on the Company provided form, of their proper mailing address and telephone number or of any change of name, address, or telephone number. The Company shall be entitled to rely upon the last known address in the Employer's official records.

## SECTION 2.4   TRANSFER OUT OF UNIT

Any Bargaining Unit Employee who is permanently promoted to a non-bargaining unit position for more than four (4) weeks shall have their seniority frozen. If they return to the bargaining unit at a later date, their seniority will start again on that return date. Anyone performing in a non-bargaining unit position intermittently (for more than one consecutive shift) will have their seniority adjusted by the amount of time spent out of the unit.

Union Members who are permanently transferred to a non-bargaining unit position shall have their Union seniority frozen. If they return to the Bargaining Unit at a later date, their seniority will be adjusted accordingly to reflect a loss of seniority accrued while out of the bargaining unit.

## SECTION 2.5   PROBATIONARY EMPLOYEES

Probationary Employees will be considered probationary for a 90 calendar day period commencing upon their first date working in the ICE Facility. All new hire training conducted off site does not count as probationary time, however, On-the-Job Training conducted on site, does count. The Union will still represent Probationary Employees for problems concerning wages, hours and working conditions, but the Company reserves the right to decide questions relating to transfers, suspensions, discipline, layoffs, or discharge of Probationary Employees without recourse to the grievance procedure contained in this Agreement.



Probationary Employees do not have seniority until the completion of the probationary period, at which time seniority dates back to the date of hire. The probationary period can be extended by mutual agreement between the Company and the Union.

6

## SECTION 2.6  TERMINATION OF SENIORITY



The seniority of an Employee shall be terminated for any of the following reasons:

a.   the Employee quits or retires;
b.   the Employee is discharged for just cause;
c.   a settlement with the Employee has been made for total disability, or for any other reason if the settlement waives further employment rights with the Employer;
d.   the Employee is laid off for a continuous period of one (1) year or 365 calendar days;
e    the U.S. Government revokes the Employee's security clearance;
f.   the Employee is permanently transferred out of the Bargaining Unit.

## ARTICLE 3

## JOB OPPORTUNITIES

## SECTION 3.1  FILLING VACANCIES

If a vacancy occurs in a regular position covered by this Agreement, and the Employer chooses to fill that vacancy, the job will be posted for a period of five (5) working days (excluding Saturdays, Sundays, and holidays). The Project Manager or designee will notify the Union President in writing of such openings. The Union President will then verify that all part-time position Custody Officers have been notified. When a vacancy occurs, the Employer will fill the position with the most senior Employee who has applied for the position in writing, who has been trained (if required) to fill any necessary special qualifications for the new position.

## SECTION 3.2  LAYOFF AND RECALL



In the event of layoff or recall, when positions are being reduced, probationary Employees will be laid off first. Should it be necessary to further reduce the work force, Employees will be retained on the basis of seniority. Recall of Employees will be accomplished by recalling the last laid off Employee first, and so on.

## SECTION 3.3  APPOINTMENT OF SUPERVISORY STAFF

The U.S. Government in its contract with the Company creates specific guidelines for the job duties and qualifications of Supervisors. Based on these guidelines, all appointments will be made on the basis of suitability as evaluated by the Company. Suitability shall include an Employee's skills, experience, past performance, capabilities, and the needs of the operation. If, in the Employer's determination, Employees are equally qualified, seniority will prevail.

## SECTION 3.4  EXCHANGE OF DAYS OFF - SHIFT ASSIGNMENT (Trade Agreements)

A.   Employees may be permitted to exchange hours of work with other Employees in the same classification or level, performing the same type of duties in the same work area, provided that:

1.   the Employees requesting the work exchange submit a formal written request to their supervisor(s), at least twenty-four (24) hours prior to the exchange.

2.   the supervisor(s) approves the exchange.

B.   The Employees exchanging hours of work shall not be entitled to any additional compensation (e.g., overtime or overtime meals,) which they would not have otherwise received.



C.   Once approved, shift changes shall not be subjected to further review, except for operational needs. If a trade agreement is denied, the supervisor denying the swap shall state the reason for the denial on the written request, providing a copy to all parties involved.

7



## ARTICLE 4

## MANAGEMENT RETAINED RIGHTS

### SECTION 4.1  BASIC MANAGEMENT RIGHTS

Management of the business and direction of the security force are exclusively the right of management.  These rights include, but are not limited to, the right to:

1.  Hire;
2   Assign work and schedule;
3.  Promote, demote;
4.  Discharge, discipline, or suspend based on Article 6;
5.  Determine the size of the workforce, including the number, if any, of Employees assigned to any particular shift.
6.  Make and enforce work rules not inconsistent with the provisions of this agreement;
7.  Require Employees to observe reasonable Employer rules and regulations;
8.  Determine when overtime shall be worked;
9.  Determine the qualifications of an Employee to perform work.

### SECTION 4.2  RIGHTS PRESERVATION

Any of the rights, power or authority the Company had prior to the signing of this Agreement are retained by the Company, except those specifically abridged or modified by this Agreement and any supplemental Agreements that may hereafter be made.  The Company's failure to exercise any function reserved to it shall not be deemed a waiver of any such rights.



## ARTICLE 5

## GRIEVANCE PROCEDURE

### SECTION 5.1  INTENT

For purposes of this Agreement, a grievance shall mean a claimed violation, misinterpretation, or misapplication of any provision of this Agreement, or the challenge of any disciplinary action taken against a Union Employee, except that this grievance procedure shall not be used for any suspension or revocation of required DO clearances by the U.S. Government.  In addition, the grievance procedures outlined herein shall not apply to any non-disciplinary situation where the Company is acting under express directives of the U.S. Government.

### SECTION 5.2  GENERAL PROVISIONS

A.  The number of days outlined in Section 5.3 in the processing and presentation of grievances shall establish the maximum time allowed for the presentation and processing of a grievance.  The term "days" shall not include Saturdays, Sundays, or holidays when used in this Article.

B.  Should either the Company, the Union, or the aggrieved Employee fail to comply with the time limits as set forth in this Article, the party who failed to comply with the time limits shall forfeit the grievance.

C.  Time limits set forth herein may be extended only by mutual agreement between the Company and the Union.



8

## SECTION 5.3  GRIEVANCE PROCEDURE



### Step 1

Any employee having a grievance under this Agreement shall first discuss his grievance with his immediate shift supervisor with his steward present. The aggrieved employee or his steward shall orally discuss the grievance with the aggrieved employee's immediate shift supervisor not later than five (5) business days after the occurrence causing the grievance.

### Step 2

If the matter is not resolved in Step 1, the grievance shall be submitted in writing signed by the aggrieved employee and his steward and submitted to the Project Manager within  ten (10) business days from the the conclusion of Step 1.  The written grievance, in addition to the above, shall contain the following:

- The Complaint
- The specific provision(s) of this Agreement allegedly violated by the conduct
- The date on which the said conduct occurred
- The date of filing of this grievance
- Signed and approved by the Local 165 Union President
- The position or demand of the Union

The Project Manager shall submit his answer in writing within ten (10) business days from receipt of the written grievance to the aggrieved employee and the steward.

### Step 3



If the matter is not resolved in Step 2, the Union may appeal the grievance in writing to the company Vice President of Human Resources within ten (10) business days from receipt of the Project Manager's answer. Within ten (10) business days from the receipt of the Union's appeal, the Vice President of Human Resources shall submit a written reply to the Union.

### Step 4

If the matter is not resolved in Step 3, the Union shall submit the grievance to the Company President (or designee) and the International Union's Regional Vice President for resolution within ten (10) business days of receipt of the written reply in Step 3.  If the matter is not resolved at this level, the matter shall then be considered for arbitration proceedings.

## SECTION 5.4  ARBITRATION PROCEDURE

Grievances processed in accordance with the requirements of Section 5.3 that remain unsettled may be processed to arbitration by the Union, giving the Company's Director of Human Resources written notice of its desire to proceed to arbitration not later than 15 days after rejection of the grievance in Step Two.  Grievances which have been processed in accordance with the requirements of Section 5.3 which remain unsettled shall be processed in accordance with the following procedures and limitations:



A.  Selection of an Arbitrator -- Within 15 days of receipt of the Union's written notice to proceed with arbitration, the Company and the Union will meet telephonically to jointly attempt to agree upon the selection of a neutral arbitrator.  If, within 15 days, the parties fail to agree upon the selection of an arbitrator, the Union will request the Federal Meditation and Conciliation Service (FMCS) to supply a list of seven (7) arbitrators.  An arbitrator will be selected from the list supplied by the FMCS by parties alternately striking from the list until one (1) name remains, and this individual shall be the arbitrator to hear the grievance.

9



B.   Decision of the Arbitrator – The arbitrator shall commence the hearing at the earliest possible date.  The decision of the arbitrator shall be final and binding upon the parties to the Agreement.  Any decision shall be complied with, without undue delay after the decision is rendered.  It is understood and agreed between the parties that the arbitrator shall have no power to add to, subtract from, or modify any of the terms of this Agreement.

C.   Arbitration Expense – The arbitrator's fees and expenses, including the cost of any hearing room, shall be shared equally between the Company and the Union.  Each party to the arbitration will be responsible for its own expenses and compensation incurred bringing any of its witnesses or other participants to the arbitration.  Any other expenses, including transcript costs, shall be borne by the party incurring such expenses.

## SECTION 5.5  CLASS ACTION

The Union shall have the right to file a group grievance (class action) or grievances involving more than one (1) Employee at the Informal Step of the grievance procedure.

## SECTION 5.6  INDIVIDUAL GRIEVANCES

No individual may move a grievance to arbitration.

## ARTICLE 6

## DISCIPLINE

## SECTION 6.1  GROUNDS FOR DISCIPLINE AND DISMISSAL



After completion of the probationary period, as specified in Section 2.5, no Employee shall be disciplined, dismissed, or suspended without just cause.  Just cause shall include any suspension or revocation of clearance by ICE.  The "final decision" on the Employee's removal shall be determined by the Government, and the Company shall be held harmless by the Union and the Employee for any further claims made after this final determination.  This provision is not intended to limit or prohibit the rights of any party to seek relief from other parties.

The Company's contract with the U.S. Government sets out performance standards and contract requirements for Custody Officers and all Employees are required to comply with these standards.  Failure to do so may lead to disciplinary action.  Employees agree to comply with any non-disciplinary directive issued by the U.S. Government.

The Company may discipline Employees when necessary and discharge those who fail to uphold U.S. Government or Company standards as described above.  It is recognized by parties to this Agreement that progressive discipline shall be applied in dealing with Employees.  However, it is also recognized that offenses may occur for which progressive discipline is not applicable (e.g. fraud, gross misconduct, theft, etc.).

Disciplinary measures vary depending on the seriousness of the matter and the past record of the Employee.  Failure to comply with any investigation procedures will result in discipline up to, and including, termination.

The actions which may, as deemed appropriate by the Employer, result in and establish just cause for discipline (up to and including immediate dismissal) shall include, but shall not be limited to:

*   Abuse of authority
*   Neglect of duties
*   Breach of security
*   Breach of chain of command



10



- Conduct which impugns or disparages the DHS, ICE, or its agents or the Employer or its agents to the Government or other third parties except when such conduct is privileged under a specific law
- Inappropriate conduct directed at or involving Government employees, detainees, members of the public, or while in uniform
- Violation of standards of conduct including but not limited to the Companies Handbooks and post orders
- Dishonesty
- Misappropriation of funds
- Theft
- Assault
- Intoxication or drinking on duty or illegal use or possession of drugs or narcotics
- Immoral conduct
- Fighting
- Breach of building/facility rules or regulation
- Sleeping while on duty
- Destruction of property
- Criminal misconduct

## SECTION 6.2  REMOVAL OF VERBAL/WRITTEN RECORDS

A.   If, during a sixty (60) day period following the date of any verbal summary of formal counseling, the Employee has received neither further formal counseling, an unsatisfactory service rating, nor any disciplinary action, and on or after the expiration of such sixty (60) day period the Employee requests the Employer to do so, the Employer shall remove the verbal summary of formal counseling from the Employee's individual personnel file.

B.   If, during a ninety (90) day period following the date of any written summary of formal counseling, the Employee has received neither further formal counseling, an unsatisfactory service rating, nor any disciplinary action, and on or after the expiration of the ninety (90) day period the Employee requests the Employer to do so, the Employer shall remove the written summary of formal counseling from the Employee's individual personnel file.

C.   It is expressly understood that no disciplinary action will be taken until the outcome of a grievance has been determined.

## ARTICLE 7

## HOURS OF WORK AND OVERTIME

### SECTION 7.1  WORKDAY AND WORKWEEK



For the purposes of this Article, a regular workweek of 40 hours of work shall constitute a normal full-time workweek for full-time Employees. Shifts shall be scheduled at the discretion of the Employer to fulfill the needs of the U.S. Government. Nothing contained herein shall guarantee to any Employee any number of hours of work per day or week.

### SECTION 7.2  OVERTIME

An overtime rate of time and one-half (1 ½ ) of An Employee's base rate of pay (exclusive of health and welfare and other fringe additions to pay) shall be paid for all hours actually worked in excess of 40 hours in a work week.

### SECTION 7.3  OVERTIME REQUIREMENT

If directed to work overtime (i.e. over 40 hours in a workweek) or extra hours, and the seniority system is not invoked due to shortness of notice to the Company, the Employee shall be required to do the work, unless the Employee is excused by the Company for good cause.

11



Assignment to overtime or the decision to use overtime to resolve a post vacancy rests with the company.  If an employee has "available" hours due to assignment to a schedule of less than 40 hours per week, such employees may first volunteer to fill vacancies, and if there are no volunteers, then mandated to fill the vacancies by inverse seniority. If an employee is held beyond the normal end of his/her shift, or called in early, that employee may voluntarily request equivalent time off versus working the entire remainder of his/her weekly schedule; provided the company is able to accommodate such request.  However, the Company will not unilaterally reduce a bid schedule without employee consent, unless the client force such action through reduction of hours required to be worked.

### SECTION 7.4  OVERTIME DISTRIBUTION

Bargaining Employees, excluding Transport/Armed Officers, will be expected to work overtime assignments within the facility.  A list of volunteers shall be compiled by seniority for each shift.  When the senior volunteer works overtime his name will go to the bottom of the list. Full-Time Officers who have missed work and wish to work hours in order to achieve 40 hours in a work-week will be afforded make-up hours first.  It is the officer's responsibility to inquire as to making up lost time, which will be awarded at the discretion of Management.

When an Employee is next on the list for mandatory overtime, they will be afforded the opportunity to refuse the overtime hours one (1) time per seniority cycle.  He/She will be passed over and the next Bargaining Unit Employee on the list will work overtime.

Mandatory overtime will be inverse to voluntary, in that the Employee with the least seniority will be required to meet the overtime requirement first.

Bargaining Employees can be contacted by phone during off duty hours and asked to voluntarily come in for overtime hours.  It is understood that no Full-Time Bargaining Employee can be ordered to come in for mandatory overtime unless emergent conditions exist, i.e., riot, hostage situation, mass evacuation, etc.



A separate mandatory list for Part-Time Employees will be maintained by Management.

### SECTION 7.5  OVERTIME FOR TRANSPORTATION/ARMED OFFICERS

Transport Officers/Armed Officers will be expected to work overtime assignments in conjunction with transportation and armed post requirements.

A list of volunteers shall be compiled by seniority for each shift.  When the senior volunteer works overtime his name will go to the bottom of the list. Full-Time Officers who have missed work and wish to work hours in order to achieve 40 hours in a work-week will be afforded make-up hours first.  It is the officer's responsibility to inquire as to making up lost time, which will be awarded at the discretion of Management.

When an Employee is next on the list for mandatory overtime, they will be afforded the opportunity to refuse the overtime hours one (1) time per seniority cycle.  He/She will be passed over and the next Bargaining Unit Employee on the list will work overtime.

Mandatory overtime will be inverse to voluntary, in that the Employee with the least seniority will be required to meet the overtime requirement first.

Bargaining Employees can be contacted by phone during off duty hours and asked to voluntarily come in for overtime hours.  It is understood that no Full-Time Bargaining Employee can be ordered to come in for mandatory overtime unless emergent conditions exist, i.e., riot, hostage situation, mass evacuation, etc.



In recognition of the fluidity of Transport Officer Schedules, the company may adjust such schedules to reduce overtime, without employee consent due to the uncertain nature of shift lengths and US DOT regulations concerning maximum driving hours during specific periods of time.  In addition, shift length maximum for Transport Officers may be up to 15 hours per day, with no more than 10 hours driving time.

12

## ARTICLE 8

## WORK SHIFTS AND PAYMENT POLICIES

### SECTION 8.1 SHIFT BIDDING, HOURS OF WORK, SPECIAL DETAILS, AND SENIORITY

The Company will have a schedule for each shift posted at least two (2) weeks in advance.

In addition to the procedure outlined in Article 3.1 "Filling Vacancies", the follow procedure will be utilized for annual shift/days off bidding:

A.   Annual shift bidding will occur in November each year, and in conjunction with the bid, all employees will also select vacation periods. Part time employees will make their selections after all full time employees. The company will guarantee no more than 10 vacation slots per week; however, the Project Manager may approve additional vacation slots, at the Company's sole discretion. If required to balance the daily schedule due to vacation absences, management may request volunteers to temporarily change their shift.

B.   At least every 12 months, the Local Union President in conjunction with the Project Manager shall produce a seniority list for the Company's review and approval at least thirty (30) days prior to the bid. The Local Union President will sign off on the list making it a valid listing. The Company will attempt to start the bidding process by 1 November of each year.

C.   The company will post the schedule for review by employees at least fifteen (15) days prior to bid commencement.

D.   The company will provide separate schedules for bid purposes:
   a.   Transportation Officers
   b.   Armed Guards
   c.   ICE-Designated/Mandated Critical Posts*
   d.   General Detention Officer Schedule

   *Note: If ICE determines that a specific employee is required for a specific schedule slot, that slot will be removed from the General Schedule and not bid.

E.   Procedure:

Officers will call in their "bids" at the appointed time listed on the schedule or report in person to bid. Each employee will be afforded 10 minutes to bid on his or her selected day and time. If an officer misses the call-in time, it will not be the responsibility of the Company to make contact with that officer. The officer that misses his or her call time will be allowed to bid when they call in, however, all officers who have already bid will not be bumped due to that officer's tardiness in bidding.

The Project Manager, Assistant Project Manager or Scheduling Officer will accept the bids during normal working hours, Monday through Friday. A union representative will be present for the entire bid call-in process, if desired by the Union.

If the above they are unavailable they will appoint another member of management to receive the bids. Officers may also bid "in person" at a designated location.

Once an officer has placed a bid, it will be considered FINAL when the next senior officer bids. It then will become permanent and no changes will be considered or accepted, until the bidding is complete. When the bidding is final, an officer's bids cannot be changed except for what has been agreed upon in this Article.



13

Once the bidding is complete and the schedule commenced, should two officers desire to swap slots, they may do so if approved by management. Swaps between companies will be allowed.



Removal from a bid schedule will not take place unless management has exhausted all of the disciplinary steps, or ICE deems it necessary (facility needs). Management will notify the affected employee in writing stating why he/she was removed or reassigned. The Company shall make every attempt to honor the employee's schedule bids: When reassigning employees due to the above reasons, the current bids should not be disrupted unless another employee volunteers to swap the entire schedule bid. If no volunteer is identified, management may mandate an exchange, but shall endeavor to observe "seniority rules" in so doing, provided the mandated officer is able to work the schedule.

When a shift becomes available due to an officer leaving the Company, that bid schedule will be posted for re-bid for one (1) week or 5 working days. After that week the most senior qualified officer who re-bid for that slot will be awarded the slot. If an officer leaves and there is less than four (4) weeks remaining to the next annual bid, the bid schedule may be covered through the use of "plug ins" until the next bidding process begins. (Plug ins are defined as inserting an officer with hours available into the bid schedule.)

Management may temporarily fill a vacant bid schedule with swaps, plug-ins or part time officers, for temporary absences due to FMLA, vacation, or injury, however, only until the next regularly scheduled bid.

After February 1, 2010, management may impose 40/32 or 32/40 schedules for officers who begin working in the facility after that date. No officers who began working in the facility prior to February 1, 2010 can be required to work such schedules, but may volunteer to do so.

**SECTION 8.2  WAGE SCHEDULE**

The base rate of pay for Custody Officers covered by this Agreement in all locations are described in detail below:

as of January 1, 2009

| | |
|---|---|
| Custody Officer | 26.55 per hour |
| Health and Welfare Allowance | *.** per regular hour worked |
| Pension | *.** per regular hour worked |
| Uniform Allowance | 0.42 per regular hour worked |

as of January 1, 2010

| | |
|---|---|
| Custody Officer | 27.50 per hour |
| Health and Welfare Allowance | 5.07 per regular hour worked |
| Pension | 1.27 per regular hour worked |
| Uniform Allowance | 0.42 per regular hour worked |

as of January 1, 2011

| | |
|---|---|
| Custody Officer | 28.45 per hour |
| Health and Welfare Allowance | *.** per regular hour worked |
| Pension | *.** per regular hour worked |
| Uniform Allowance | 0.42 per regular hour worked |

** The parties agree that either party may reopen negotiations for amendments to Health and Welfare Allowance at any time after September 1 and before October 1, for all years governed by this contract, by giving written notice to the other party. Any final agreement resulting from said negotiation shall be incorporated into the terms of this agreement.



14



If the parties fail to reach agreement, the dispute shall be submitted to arbitration in accordance with Article 5 of this Agreement. All provisions of this Agreement, including, but not limited to, Article 16, shall remain in force during the terms of the negotiations and any resulting arbitration, and for the remainder of the terms of this Agreement.

## SECTION 8.3  PAYDAY

Payday for all hourly Employees will be no later than 11 a.m. on Friday following the two (2) week pay period ending on Saturday, subject to change by mutual agreement. Direct deposit is available, and the company will make this option available to all Employees.

## SECTION 8.4  UNDISPUTED ERROR

In case of an undisputed error on the part of the Company as to an Employee's rate of pay, proper adjustment will be made in the next paycheck after the error has been brought in written form to the Company's attention. Any error, involving eight (8) hours of pay or more, will be corrected and paid within three (3) working days.

## SECTION 8.5  SHIFT DIFFERENTIAL

Employees working between the hours of 1500 and 2300, or any part thereof, will be paid a shift differential of 4%. Those Employees working between the hours of 2300 and 0700, or any part thereof, will be paid a shift differential of 6%. Shift differential for pre-shift muster and post shift walk time is paid at the same rate as the shift worked.

## SECTION 8.6  SHIFT SPECIAL DETAILS

All special details will be (3) months in length and will be bid on and awarded by seniority. No Part-Time Employee may be assigned a special detail unless Management needs that Part-Time Employee to fill in the slot while the Full-Time Employee is scheduled off.

For the purposes of bidding for special details, union seniority shall be defined as seniority within the work site.



## ARTICLE 9

## HOLIDAYS

### SECTION 9.1  HOLIDAYS DEFINED

Whenever the term "holiday" is used, it shall mean:

| | | |
|---|---|---|
| New Year's Day | Independence Day | Veteran's Day |
| Columbus Day | Christmas Day | Labor Day |
| Martin Luther King Birthday | President's Day | Memorial Day |
| Thanksgiving Day | Good Friday | Employee Birthday |

### SECTION 9.2  MISCELLANEOUS HOLIDAY PROVISIONS

A.   A full-time Employee who is not required to work on a holiday shall be paid eight (8) hours straight time, exclusive of any shift differential for that holiday.

B.   Any full-time Employee who works as scheduled on a holiday shall receive the Employee's appropriate rate of pay times 1 ½ for all hours worked, and in addition, shall receive eight (8) hours holiday pay at the regular rate as described in (A) above.

C.   Any part-time position Employee who works as scheduled on a holiday shall receive the Employee's appropriate rate of pay 1 ½ times for all hours worked, and in addition, shall receive prorated holiday pay

15

based on the number of actual hours the Employee worked in the two (2) week pay period prior to the holiday.



D.   The holidays listed in this article will be paid on the date designated for observance by the Federal Government, with the exception of New Years Day (January 1st), Independence Day (July 4th), and Christmas Day (December 25th), which shall be paid on those dates.

E.   Any Employee who is requested and agrees to work on any of the above named holidays, but fails   to report to work for such holiday, shall not receive holiday pay.  Employees must work the scheduled day before and the scheduled day after to receive holiday pay.

## ARTICLE 10

## VACATIONS

### SECTION 10.1 ELIGIBLE FULL-TIME EMPLOYEES

Eligibility for vacation benefits shall be based on Department of Labor (DOL) rules under Service Contract Act.

Eligible full-time Employees shall be entitled to annual vacation based on their continuous years of service with the Employer (based on the Employee's anniversary date of employment) at their individual hourly rate of pay at the time payment is made in accordance with the following schedule:

| | |
|---|---|
| Upon completion of one (1) year of service: | 80 hours |
| Upon completion of five (5) years of service: | 120 hours |
| Upon completion of (10) years of service: | 160 hours |
| Upon completion of (15) years of service: | 200 hours |

### SECTION 10.2 ELIGIBLE PART-TIME EMPLOYEES

Part-time Employees are eligible for vacation benefits on a prorated basis, based on 2080 hours and defined by the maximums allowed in the contract.  All paid hours during the preceding year will be used to figure the Employee's work hours.

### SECTION 10.3 SCHEDULING VACATIONS

Vacations, insofar as is reasonably possible, shall be granted at the times most desired by the Employee, after the Employee's anniversary date.  Employees who cash out vacation time are not entitled to participate in the vacation selection process, nor take vacation during the year unless approved under the guidelines for Leave Without Pay, as outlined in Article 11.

Employees will pick vacation by full-time seniority with 30 days to pick between November 1st and November 30th of each year.  The Employee shall be ready to pick when asked.  If not ready, the Employee will be passed over and pick what is available when ready.

Once the Employee has picked his/her vacation by seniority, the Company will post a list of vacation schedules no later than January 1st of each year.  Once posted, management cannot make any changes except as needed to maintain continuity of operations of the Service Processing Center.  Employees will submit a written request based on available openings.  This process is limited to vacation selections of one (1) week increments.

All other vacation requests must be made in writing not less than two (2) weeks prior to the proposed vacation dates.  The Company will respond to these other requests within five (5) working days.



16



### SECTION 10.4 UNUSED VACATION

Employee vacation may be cashed out upon their anniversary, or up to one half of an employee's vacation may be rolled over from year to year. When cashed out, rolled over vacation is paid at the wage rate in effect when earned.

### SECTION 10.5 PAY IN LIEU OF VACATION LEAVE

At any time during the year, Employees may request in writing to be paid for earned vacation pay in lieu of taking actual vacation leave. Earned vacation pay will be paid in the next pay cycle.

### SECTION 10.6 TERMINATING EMPLOYEES

Upon termination of employment, Employees will be paid at their individual hourly rate vacation time earned as of their last anniversary date, but not used, as entitled by the Service Contract Act. (Example: An Employee who terminates one month into the next anniversary year is entitled to any of the previous year's earned accrued vacation not already used, and not to the additional month accrued in the new anniversary period.)

### SECTION 10.7 VACATION -- LAID OFF EMPLOYEES

Length of service with the Employer shall accrue for the purposes of vacation benefits while an Employee is on laid-off status for up to one (1) year. Employees will only be paid vacation benefits upon returning to work.

### SECTION 10.8 VACATION INCREMENTS

Consistent with Employer approval, efficiency, and economy of operations, Employees with two (2) or more weeks of vacation may take their vacation in segments of less than one (1) week each. Vacation must be taken in one (1) day, eight (8) hour increments.



### SECTION 10.9 LEAVE TIME DONATION

If a Local 165 Employee is catastrophically ill or injured or if the spouse or child of such a Local 165 Employee becomes catastrophically ill or injured, Local 165 Employees, with the Company's approval, may donate vacation or personal leave time to the impacted Employee. Donations must be made in whole hours, noted on a form to be provided by the Employer, and will be cashed out on an hour-for-hour basis to the impacted Employee on the next pay period. This section is not subject to the grievance and arbitration provisions of this contract. Nothing in this section shall require or prohibit the Union or the Employer from matching Employee donations or making donation of their own.

## ARTICLE 11

## LEAVES OF ABSENCE

### SECTION 11.1 LIMITATIONS

Personal leaves of absence for non-medical emergencies may be granted at the sole discretion of the Employer without loss of seniority to the Employee. Such leaves, if granted, are not to exceed 30 days, unless a special extension is approved by the Employer. An Employee on any unpaid leave of absence will be required to use available vacation or personal leave time in full before beginning the unpaid leave. Length of service with the Employer shall not accrue for purposes of vacation, holiday, or other accrued benefits for any unpaid leave of absence over thirty (30) days. The Employer will make every reasonable effort to maintain An Employee's position while on a non-statutory unpaid leave of absence. Unpaid leaves of absence may be taken only with written approval of the Employer or in case of verified personal emergency. Failure to report for scheduled shifts without Employer permission may face disciplinary action.



17



Any full-time Employee who uses more than two (2) days of leave without pay (LWOP) per Government contract year for absences not covered by Family and Medical Leave Act of 1993 (FMLA), Worker Compensation, or whose absence is not a Company approved accommodation and/or leave, may face disciplinary action.

## SECTION 11.2 MEDICAL LEAVE

A.   The Family and Medical Leave Act of 1993 (FMLA) is incorporated, herein.

B.   The Company agrees to honor the FMLA for all eligible Employees.

C.   During medical leave, the Employee shall be required to furnish a report from the doctor when requested periodically by the Employer. Upon the expiration of said leave, the Employee shall furnish the Employer with a statement, signed by the doctor, which establishes the fitness of the Employee to return to the Employee's previously held work.

D.   If the Employee files for medical leave on false pretext or works for another employer without pre-authorization from the Company, the Employee will be removed from the Custody Officer program and from employment with Employer.

## SECTION 11.3 MILITARY LEAVE

An Employee of the Company who is activated, volunteers, or is drafted into any branch of the armed forces of the United States under the provisions of the Selective Service Act or Reserve Forces Act shall be granted an unpaid military leave of absence, as required under the federal law, for the time spent in full-time active duty. The period of such leave shall be determined in accordance with applicable federal laws in effect at the time of such leave.

## SECTION 11.4 UNION LEAVE



The Company agrees to grant five (5) days, at one time, of Union Leave (LWOP) to Union Officers (Maximum of 5 Employees, with no more than 3 per shift), as long as staffing permits, upon 14 days written request for the purpose of attending Union Conventions, or other meetings of vital interest to the Union, for the duration required to perform the duties of the position, which he/she was elected or appointed and with seven (7) days notice for a Local meeting of one (1) day or less or 14 days notice for more than one (1) day of leave.

## SECTION 11.5 PERSONAL / SICK LEAVE

Each Employee shall be entitled to 9 days of Personal/Sick leave per full contract year, all days made available on their anniversary date. Of the 9 sick day entitlement, four (4) days shall be available for cash-out at the end of the Employee's anniversary year with the remaining five (5) days kept on the books. In addition, employees may roll over all remaining sick days from year to year. Rolled over sick days, when cashed out, are paid at the rate of pay in effect when earned.

A.   Sick days shall be used in no less than eight (8) hour increments and shall be paid when taken by the Employee.

B.   Upon termination of employment, Employee will be paid at their individual hourly rate for any unused, earned personal leave, based upon the number of actual hours Employee worked during that year based on hire date anniversary. If the Employee has used more personal days upon termination than he/she earned based upon time worked on the contract, the amount of the overage will be deducted from the Employee's final paycheck.

C.   Sick (and vacation) days may be used to cover absences caused by illness. Any Employee who is unable to report to work because of sickness must notify the Employer at least two (2) hours prior to the beginning of his/her regular shift in order to be eligible for paid sick leave benefits. Proof of illness may be required after two (2) days. Disciplinary action may result from excessive or unapproved absenteeism.



18

### SECTION 11.6 PROCESSING UNPAID LEAVES OF ABSENCE



The Employer will consider requests for unpaid leaves of absence and may grant them at its sole discretion. An unpaid leave of absence must be processed in the following manner:

A. All requests for unpaid leaves of absence shall be submitted in writing to the site Project Manager or designee at least 10 calendar days prior to the date the leave will take effect, except in cases of verified personal emergencies, and include:
   1. The reasons for such leave;
   2. The effective dates of such leave;
   3. The estimated date of return to work.

B. The Company will respond to the request within seven (7) working days.

C. The written request for leave of absence shall be submitted to the Project Manager for final approval. If the request for the leave of absence is approved by the Project Manager, a copy of the approved leave of absence will be given to the Employee involved.

D. Extensions of the leave of absence may be granted at the sole discretion of the Employer, upon written request by the Employee within 10 calendar days prior to the expiration of the leave of absence. Extensions, when granted, shall not total more than 30 days.

### SECTION 11.7 GENERAL PROVISIONS

Seniority shall accumulate during the period of any approved leave of absence subject to the provisions of this Agreement.

### SECTION 11.8 JURY DUTY



Full time Employees with one or more years of continuous service will be reimbursed up to 5 days in any calendar year for any loss of income during their otherwise scheduled workweek for time spent on Jury Duty. Said reimbursement shall be offset by any jury fees received by the Employee. Employees must inform their supervisor immediately upon receiving a notice to report for Jury Duty. The Employee reserves the right to request an exemption when the Employer determines that the Employee's absence would create hardship.

### SECTION 11.9 BEREAVEMENT LEAVE

If necessary for an Employee to lose time from work because of a death in the immediate family, the Employee shall be entitled to paid bereavement leave, excluding days off, as follows:

Immediate family is defined as an Employee's:

   a. Father or Mother – 7 days
   b. Spouse/domestic partner – 10 days
   c. Sister or Brother – 5 days
   d. Child (including legally adopted children and/or step children) – 10 days
   e. Father or Mother in Law – 5 days
   f. Sister or Brother in Law – 5 days
   g. Grandparent (Grandparent in Law) – 5 days
   h. Grandchild – 5 days



The Employer reserves the right to verify all bereavement leave requests and may require proof of the death for which the Employee requests leave. Should employees required additional time off due to bereavement, the company may grant vacation/sick leave or unpaid time off at its sole discretion, subject to staffing availability to cover the additional absences.

## SECTION 11.10 ABSENTEEISM FROM DUTY



When an Employee fails to report for duty, and does not notify Management prior to the scheduled shift, it is considered a "no-call/no-show". In the event an emergency prevents an Employee from reporting to work and notifying the office prior to the scheduled shift, an Employee must contact the appropriate supervisor as soon as possible and explain the failure to report for duty. Explanations are subject to verification. Unverified and unexcused absences from duty will result in disciplinary action.

When an Employee fails to call in two (2) hours prior to the start of the shift, the Employee is subject to disciplinary action, as this prevents Management from filling an unoccupied post in a timely manner.

If an Employee comes to work late, the Employee will only be disciplined as coming in late not for a no-call/no-show. If the Employee notifies Management of the impending tardiness prior to the start of the shift, the Employee may still be subject to discipline unless there are verifiable reasons for the tardiness.

The Company considers that an Employee has resigned their position voluntarily (voluntary separation) if the Employee is absent from duty due to "no-call/no-show" more than three (3) shifts or two (2) consecutive days in a 12 month period.

## SECTION 11.11  VOLUNTARY LEAVE

In the event that Management has scheduled more Officers than required for shift operations, Management will compose a voluntary list before the start of the shift that will give any full-time Officers the opportunity to leave voluntarily. The selection process will be based on seniority. The Officer, who signed the list that has the most seniority and has not gone home, will be selected.



When the Officer has been selected, the Officer will then sign a voluntary leave form which will be maintained by Management. The Officer will be able to leave without pay, use a personal/sick day, or use a day of annual leave. The voluntary Departure List will be maintained by Management, and by request, a copy of said list will be made available to the Union.

### ARTICLE 12

### HEALTH, WELFARE, AND UNIFORM ALLOWANCES

## SECTION 1:

We agree to recognize the following Health and Benefit Rate effective January 1, 2010:  $5.07 per hour.  Health and Welfare Rate re-opens each year thereafter.

## SECTION 2:

The appropriate hourly Health and Welfare monies will be forwarded to the Union's Third Party Administrator no less than five (5) working days after each payday.  It is the Union's responsibility to notify the companies of the name of the Union's Third Party Administrator and any changes relative to the same.

## SECTION 3:



The Employer's responsibility under this Article is the withholding and forwarding to the Union or its designated Third Party Administrator, Health and Welfare monies plus any additional funds deducted, as authorized by the employees, and prescribed under Section 4.  The Employer must be provided with the necessary documentation from said employee, confirming employee's withholding election.  The Union will be, solely and exclusively, responsible for all aspects of Administration of its Health Plan coverage, benefits and any other supplemental benefits provided to the employees through the Union.

20



**SECTION 4:**

Subject to the conditions and particulars listed above, any additional or required employee contributions for Health Insurance Coverage or any other supplemental benefits offered by or through the Union will, at the employee's option, be deducted by means of a payroll deduction. The Employer must be provided with the necessary documentation to confirm such employee election.

As a condition of the Employer being responsible for withholding and forwarded all such monies for any employee covered under this Agreement and eligible for such contribution, all such employees must complete an authorization form, which authorizes the Employer to deduct any/all contribution made for said employees. Such authorization shall specify amounts to be deducted from the employee's paycheck.

For any/all errors relative to such contributions, said errors meaning errors made by the employee in completing any forms, the responsibility for said error shall be employees. For any/all periods when the employee was ineligible, ineligible employees are those who are not on active duty status, the employer shall have the right to recover such contributions from the employee.

**SECTION 5:**

To enable the Union benefit consultants to go to market is an attempt to improve member health benefits, the Company agrees to provide the necessary data for the benefit consultants to obtain quotes. This will include a census, prior and current plan designs, etc. The employer also agrees to supply the Union with a list of new employees each month. The Union shall have the right to fund the plan prior to giving said employee health benefits.

**SECTION 6:**  Notwithstanding the above, the Local Union may elect either the International SPFPA Union-provided insurance plan or a company-only offered and sponsored insurance plan.



**SECTION 12.2 UNIFORM ALLOWANCE**

The Employer will pay the Employee an allowance for each hour worked, up to 40 hours per week, for uniform maintenance as described herein.

## ARTICLE 13

### MISCELLANEOUS PROVISIONS

**SECTION 13.1 BULLETIN BOARDS**

The Employer will make its best effort to obtain a space from the US Government for the Local to locate a Union-provided bulletin board that will be used by the Union for posting of notices of meetings, elections, appointments, recreational and social affairs, and other Union notices. The provision of these facilities is the prerogative of the US Government, who owns and controls all worksite facilities.

**SECTION 13.2 PHYSICAL EXAMINATION**

The Employer has the right to choose the physician who will perform any physical exam that may be required. Medical exams may be required by the US Government contract, or should the Employer have concerns regarding an Employee's fitness for duty. The Employer may designate the physician or clinic at its discretion. Physical fitness is an important job requirement. Employees must pass the medical exam prescribed by the Employer's contract with the US Government in order to be employed and to maintain employment.



The Employer will pay for the time required for the Employee to take required physical exams. Time for any exams requiring more than two (2) hours must be pre-approved by the site supervisor. If, when the appointment is

going to exceed two (2) hours, the Employee will call into the Project Manager or designee to inform them of the delay and request approval for additional time.



## SECTION 13.3 DRUG AND ALCOHOL PROGRAM

The Parties recognize that, given the safety and sensitivity of the environment, and the nature of the work performed by the Company and its Employees, the use of controlled substances or alcohol on the job poses a substantial risk to all Employees, the detained population, the Company, and to members of the public. To prevent or limit such risk, and pursuant to the Company's policy to maintain a drug-free workplace, random drug and alcohol screening will occur. Such policy shall be subject to revision by the Company by mutual agreement with the Union. The Company will pay for any time used by An Employee taking an initial drug test that finds a negative result.

## SECTION 13.4 UNION MEETINGS

Neither Union Officials nor Union Members shall, during working time (excluding break and lunch periods), solicit membership, receive applications, hold meetings or any kind for the transaction of Union business, or conduct any Union activity other than the handling of grievances as described in this Agreement. No Employee may leave their post without permission from the Employer under any circumstances, unless there is appropriate Government permission granted. No Employee may be at the worksite at any time unless engaged in company approved activities.

With prior approval from the Company Project Manager, Local Representatives may distribute items to Members such as forms or documents pertaining to retirement plans or insurance programs. Any such distribution must be conducted during authorized breaks and cannot interfere with the operational tempo of the Security Force.

## SECTION 13.5 UNION PRESENTATION



Local Union Committee Members will be afforded an opportunity to address newly hired Custody Officers and provide each of them with a "Welcome Aboard Package" containing a condensed version of pertinent information regarding employment at the El Centro Service Processing Center. The Security Force Project Manager and Training Department Personnel will determine time allotted for said audience.

Should it be determined that due to time limitations the above audience is not possible during formal orientation, the Project Manager will make available a time for newly hired Custody Officers to meet with Local Union Committee Members, en masse. At least one Local Union representative shall be released from work on administrative leave to attend said meeting.

In an effort to promote Union/Management relations, the Local extends an open invitation to the Project Manager to attend all such initial greetings as an observer, with the understanding that in the capacity of an observer, they are not to interfere with the Union presentation.

## SECTION 13.6 MANAGEMENT / LABOR RELATIONS

In the interest of good communications, the Company and the Union agree there shall be a Labor and Management Meeting consisting of three (3) representatives of the Union and up to three (3) representatives from the Company. Both Parties will mutually agree upon any additional participants. The purpose of this meeting will be to improve labor/management relations by providing an informal forum for the free exchange of views and discussion of mutual concerns of both Parties. It is clearly not the intention that this exchange by-pass the normal grievance procedure. Any agreements reached at these meetings to change practices or policies shall be put in writing and will only be effective when signed by both parties.



It is suggested that these meetings will be held on a monthly basis. All scheduled meeting times and places will be mutually agreed to by both parties.

22



## SECTION 13.7 ACCESS TO PERSONNEL FILES

As possible, and in accordance with applicable laws, the Union shall have access to personnel records of An Employee in conjunction with the investigation of a grievance or for use in arbitration. The Union will present written authorization from the Employee before access will be granted. The Union shall maintain the confidentiality of all information contained therein.

## SECTION 13.8 CONFIDENTIALITY OF MEDICAL RECORDS

To ensure strict confidentiality, only authorized representatives of the Employer, or authorized Union Representatives, with the Employee's written permission, shall possess or have access to any Employee medical records, including sick leave affidavits, records prepared by a private physician, rehabilitation facility, or other resource for professional assistance.

## SECTION 13.9 GUARD CARDS AND PERMITS

All Employees shall submit to the Company within 15 calendar days of the execution of this agreement, a copy of the California Guard Card. All Employees shall be required, at their own expense, to maintain a valid California Guard Card. In the event that the Employee's California Department of Consumer Affairs Guard Card Permit lapses or becomes otherwise invalidated, the Employer may temporarily suspend, but not discharge, the Employee. Once having proof that the payment renewal was sent within the 90 days guideline set forth by the Department of Consumer Affairs, the Employee may continue employment as long as the Employee has shown proper documentation that their guard card is valid.

## SECTION 13.10 TRAINING



The Company agrees to pay Employees for required and mandated government and/or Company training to the extent required by the contract between ICE and the Company.

## SECTION 13.11 PRE-POST SHIFT ACTIVITY

Employees will be paid for all pre/post shift work done at the site at the direction of the Company/Client; this is compensable time paid at their regular shift rate for pre-shift muster and post shift walk time. If other work is required, such as hold over for completion of reports, such time shall be reported to their supervisor and compensated at their regular shift rate. A four (4) hour holdover would be paid at the shift rate for which the officer was held over or called in.

## SECTION 13.12 WAGE PAY/CALCULATIONS

| A. Term | Definition/Clarification |
|---|---|
| Full Time Employee | Employee's regular bid schedule is 32 or more hours per week. |
| Part Time Employee | Employee's regular bid schedule is less than 32 hours per week |
| Benefits | Refers to Health & Welfare (H&W), Pension and Uniform Allowance. These Benefits are paid at a maximum of 40 hours per work week. |
| Base Rate | Equals the day shift hourly rate with no additions |
| Regular or Individual Rate | Equals the Base Rate plus any shift differential, uniform allowance, and benefits such as H&W and Pension (H&W and Pension are not paid in "cash"). |
| Training Rate | Paid at Regular Rate minus shift differential |
| Overtime Rate | Equals day shift hourly rate times 1.5, plus straight rate shift differential |
| Vacation Pay-Time Off | Computed at the officer's individual rate |
| Vacation Pay-Cashed In | Computed at the Base Rate |
| Sick Leave-Time Off | Computed at the officer's individual rate |



23



| Sick Leave-Cashed In | Computed at the Base Rate |
|---|---|
| Jury/Bereavement | Computed at the Base Rate (Jury Duty is less any jury pay received)  Copy of Jury duty payment is required when submitting claim. |
| Holiday Worked Rate | Full Time Employees:<br>Base Rate + shift differential times 1.5 for all hours worked on holiday; and straight uniform allowance for hours worked; plus eight (8) hours pay at Base Rate<br>Part Time Employees:<br>Paid at same rate as Full Time Employees; but the "premium" number of hours determined by prorating 8 hours as percentage of hours worked in the previous two week period. |
| Holiday Not Worked | Full Time Employees receive 8 hours pay at Base Rate<br>Part Time Employees:  Paid at same rate as Full Time Employees; but the "premium" number of hours determined by prorating 8 hours as percentage of hours worked in the previous two week period. |
| Birthday falling on other holiday | In the event an employee's birthday falls on the day another holiday is observed,  the employee will be paid for his/her birthday holiday on a date of the employee's choice within the same week as the employee's birthday. |
| Holiday Overtime Worked Rate | If working the holiday puts an employee into overtime, the rate is calculated at Base Holiday Rate (which is 1.5 times Base Rate) x 1.5 for overtime hours worked.  This calculation does not include shift differentials or uniform allowance, nor is it applied to the hours of additional base rate pay received. |
| Shift Differential | Employees are paid shift differential based their regular shift rate including muster, walk time or post shift work requirements, such as report writing.  If an employee is held over or called in early, the employee is paid for the appropriate shift differential for the period of the hold over, or call in. |

## ARTICLE 14

### 401(k) PLAN



The Employer's responsibility under this Article is the withholding and forwarding to the Union's designated 401K Funds Administrator any funds deducted, as authorized by the Employee.  The Employer must be provided with the necessary documentation from said Employee, confirming Employee's withholding election.  The Union will be solely and exclusively responsible for all aspects of Administration of its SPFPA 401K Plan coverage provided to the Employees through the Union.

As a condition of the Employer being responsible for withholding and forwarding all such monies for any Employee covered under this Agreement and eligible for such contributions, all such Employees must complete an authorization form, which authorizes the Employer to deduct any/all contributions made for said Employees.  Such authorization shall specify amounts to be deducted from the Employee's paycheck.

For any/all error(s) relative to such contributions, said error meaning errors made by the Employee in completing any forms, the responsibility for said error shall be the Employee's.

For any/all periods when the Employee was ineligible, ineligible Employees are those who are not on active duty status, the Employer shall have the right to recover such contributions from the Employee.

Payments to the Union's 401K Funds Administrator shall be forwarded by the Employer to the Union's 401K Funds Administrator by the thirtieth (30th) day of the month for those Employees who have submitted enrollment authorization by the first (1st) of the month.  It is the Union's responsibility to notify the Employer of the name of the Union's 401K Funds Administrator and any changes relative to same.



24



## ARTICLE 15

## SAFETY



### SECTION 15.1 SAFETY POLICY

It is the policy of the Company to make its best efforts to provide Employees with places and conditions of employment that are free from or protected against occupational safety and health hazards. Under this Agreement, all worksites and facilities are the property of the US Government, who is responsible for the condition and safety of the worksite.

While there is a safety committee in place at the site, the Union will continue to select the representative for the committee.

### SECTION 15.2 OSHA STANDARDS

The Company will report any safety violations observed or reported to the Company in any US Government-provided workstation or break-room.

## ARTICLE 16

## CONTINUITY OF OPERATIONS

### SECTION 16.1 NO STRIKES

A.  Both the Company and the Union agree that continuity of operations is of the utmost importance to the Company's security operations.  Therefore, so long as this Agreement is in effect, the Union and the Company agree that there will be no strikes, lockouts, work stoppages, illegal picket lines, slowdowns, or secondary boycotts during the term of this Agreement.

B.  Upon hearing of an unauthorized strike, slowdown, stoppage of work, planned inefficiency, or any curtailment of work or restriction or interference with the operation of the Employer, the Union shall take affirmative action to avert or bring such activity to prompt termination.

### SECTION 16.2 LOCKOUTS

During the life of this Agreement, the Employer shall not lockout any Employee covered in this Agreement.

## ARTICLE 17

## SEPARABILITY OF CONTRACT

In the event that any provision of this Agreement shall at any time be declared invalid by any court of competent jurisdiction or through US Government regulations or decree, such Parties hereto agree to renegotiate such provision(s) of this Agreement for the purpose of making them conform to the decree or US Government statutes, so long as they shall remain legally effective.  It is the express intention of the Parties hereto that all other provisions not declared invalid shall remain in full force and effect.

## ARTICLE 18

## ENTIRE AGREEMENT

The Parties acknowledge that during negotiations that resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to all proper subjects of collective bargaining; that all

such subjects were discussed and negotiated upon; and that the agreements contained herein were arrived at after free exercise of such rights and opportunities.

Therefore, the Company and the Union shall not be obligated to bargain collectively on any matter pertaining to conditions of employment, including but not limited to, rates of pay, wages, hours of work, disciplinary actions, training requirements, etc., during the terms of this Agreement, except as specifically provided for in other provisions of this Agreement.

## ARTICLE 19

## DURATION

This Agreement shall be effective from January 1, 2010 to December 31, 2011 and supersedes any and all prior agreements or understandings between the Parties.

IN WITNESS WHEREOF, the Parties have caused their representatives to sign this Agreement as full acknowledgment of their intention to be bound by the Agreement.

FOR:   International Union, Security, Police and Fire Professionals of America (SPFPA)

BY:   _Don Eagle_

TITLE: _VP Region 8 (SPFPA)_
DATE: _1-26-10_


FOR: International Union, Security, Police and Fire Professionals of America (SPFPA), Local 165

BY:   _____

TITLE: _President SPFPA Local 165_
DATE: _1-26-2010_


FOR:   Asset Protection & Security Services, LP

BY:   _____

TITLE:   _VP_
DATE:   _1/28/10_


FOR:   AHTNA Technical Services, Inc.

BY:   _Carolyn Craig_

TITLE: _President/CEO_
DATE: _1-28-10_


26

**APPENDIX A**



Pay elements for Armed Transport/Armed Gate Guard Officers

| | 07/01/09 | 07/01/10 | 07/01/11 |
|---|---|---|---|
| Pay Element | | | |
| Base Hourly Rate | $27.80 | $28.75 | $29.70 |
| Uniform | $ 0.42 | $ 0.42 | $ 0.42 |
| Health & Welfare | $ 4.70 | $5.07 | ** |
| Pension | $ 1.27 | $1.27* | ** |

All other benefits are equivalent to unarmed detention officers such as sick leave, vacation, shift differential, etc.

\*   Date of Raise for H&W modified to January 1, of each year to coincide with all other employees
\*\* To be determined

Pay elements for Unarmed Detention Officers

| | 01/01/09 | 01/01/10 | 01/01/11 |
|---|---|---|---|
| Pay Element | | | |
| Base Hourly Rate | $26.55 | $27.50 | $28.45 |
| Uniform | $ 0.42 | $ 0.42 | $ 0.42 |
| Health & Welfare | $ 4.70 | $5.07 | ** |
| Pension | $ 1.27 | $1.27 | ** |





27



This Agreement is executed to set the Health & Welfare and Pension Rates for the period July 1, 2011 to June 30, 2012.

The parties agree to reopen Health & Welfare/Pension rate discussions on or about April of each year for the purpose of determining Health & Welfare/Pension rates for the subsequent contract year.

The Health & Welfare Rate effective July 1, 2011 is $5.30 per hour.
The Pension Rate effective July 1, 2011 is $1.27 per hour.

This Amendment regarding the Health & Welfare Rate and Pension Rate shall be effective from July 1, 2011 to June 30, 2012 and supersedes any and all prior agreements or understandings between the Parties.

IN WITNESS WHEREOF, the Parties have caused their representatives to sign this Agreement as full acknowledgment of their intention to be bound by the Agreement.

FOR:   International Union, Security, Police and Fire Professionals of America (SPFPA):

FRANK L. GRTLEY
PRINTED NAME

PRESIDENT LOCAL 165
TITLE

SIGNATURE

5/7/11
DATE

FOR: International Union, Security, Police and Fire Professionals of America, Local 165     (SPFPA)

Don Eagle
PRINTED NAME

VP Region 3
TITLE

SIGNATURE

5-7-11
DATE

FOR:   Asset Protection & Security Services, LP

PRINTED NAME

TITLE

SIGNATURE

DATE

FOR:   AHTNA Technical Services, Inc.

PRINTED NAME

Sr VP. COO
TITLE

SIGNATURE

5/9/11
DATE

8/23 CB 'UP

SUM-100

# SUMMONS
## (CITACION JUDICIAL)



ENDORSED
JUL 01 2013
SUPERIOR COURT
COUNTY OF IMPERIAL
KRISTINE S. KUSSMAN, CLERK
BY ROSA DORAME, DEPUTY

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
ASSET PROTECTION & SECURITY SERVICES, LP;
AHTNA TECHNICAL SERVICES, INC; and DOES 1-45

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JOSE GALVAN

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Imperial County Superior Court<br>939 West Main Street, El Centro, CA 92243 | CASE NUMBER:<br>*(Número del Caso):* ECU07733 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Adrian Cress, Cress Law Firm, 2445 Fifth Avenue, Suite 330, San Diego, CA 92101 (619) 393-2126

| DATE:<br>*(Fecha)* JUL 01 2013 | Kristine Kussman Clerk, by<br>*(Secretario)* ROSA DORAME | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* AHTNA Technical Services, Inc
   under: ☒ CCP 416.10 (corporation)         ☐ CCP 416.60 (minor)
           ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
           ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
           ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

Exhibit B
Page 1 of 33

1   Adrian Cress, Esq. SBN 264549
    CRESS LAW FIRM
2   2425 Fifth Ave., Ste. 330
    San Diego, CA 92101
3   Phone: (619) 393-2126
    Fax: (619) 393-2127
4   Email: acress@cresslawfirm.com

5
    Attorney for Plaintiff JOSE GALVAN
6

7

8

9                    SUPERIOR COURT OF THE STATE OF CALIFORNA

10                            COUNTY OF IMPERIAL

11   JOSE GALVAN, an individual.          Case No.: ECU07733

12                                         (VERIFIED) COMPLAINT
         Plaintiffs,
13                                         1.  RACE DISCRIMINATION
         vs.
14                                         2.  RACE HARASSMENT

15   ASSET PROTECTION & SECURITY          3.  NATIONAL ORIGIN
     SERVICES, LP; AHTNA TECHNICAL            DISCRIMINATION
16   SERVICES, INC; and DOES 1-45
                                           4.  DISABILITY DISCRIMINATION
17
                                           5.  DISABILITY HARASSMENT
18
                                           6.  RETALIATION (FEHA
19                                             PROTECTED COMPLAINT)
20
                                           7.  RETALIATION (EXERCISE OF
21                                             FLMA RIGHTS)

22                                         8.  TERMINATION IN VIOLATION OF
                                               PUBLIC POLICY
23

24

25

26

27

28

                                -1-
                         (VERIFIED) COMPLAINT

ENDORSED
JUL 0 1 2013
SUPERIOR COURT
COUNTY OF IMPERIAL
KRISTINE S. KUSSMAN, CLERK
BY ROSA DORAME, DEPUTY

Assigned for all purpose to Judge
including trial

## FACTS COMMON TO ALL CAUSES OF ACTION

1)   Plaintiff Jose Galvan is an individual.

2)   Defendant Asset Protection and Security Services, LP (hereinafter "Asset Protection") is a limited partnership organized and existing under the laws of the state of Texas and doing business within the state of California.

3)   Defendant AHTNA TECHNICAL SERVICES, INC. is a corporation existing under the laws of the state of California. Plaintiff is informed and believes that ATSI provides human resources management services to Asset Protection, Inc. and is an alter-ego thereto.

4)   Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 1-45, inclusive, and therefore sues these defendants by these fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of these fictitiously named defendants is in some manner responsible for the injury and damage to plaintiff alleged herein.

5)   Plaintiff is informed and believes, and thereupon alleges, that in acting, or failing to act, as hereinafter set forth, each and every defendant was acting as the agent, servant, employee, principal, master and employer of each remaining co-defendant, within the course and scope of such agency, servitude and employment, and with the express or implied consent, knowledge and ratification of each such remaining co-defendant.

6)   On or about March 8, 2010, Plaintiff entered into an employment relationship wherein Plaintiff was hired in the position of Guard at the Immigration and Customs Enforcement facility located in El Centro, CA (hereinafter "ICE" or "the ICE facility")

7)   At the time he was hired by Defendant, Plaintiff has a long history of successful highly responsible positions at various institutions. This work has included serving on large and highly racially and ethnically diverse guard staffs in which the full gambit of stress, danger and camaraderie associated with guarding and correctional work.

8)   During the course of his employment with Defendants, Plaintiff performed various

-2-
(VERIFIED) COMPLAINT

responsibilities in an exemplary fashion, and otherwise capably performed each and every condition of the employment relationship.

9)        Despite Plaintiff's considerable record of success in guarding and correctional positions at similar institutions, he began to experience problems immediately upon beginning work for Defendants.

10)       In particular, upon being hired by Defendant, on his first day at the job, a problem arose with respect to Mr. Galvan's medical shaving waiver.  Mr. Galvan presented the waiver to his management, who was surprised and incredulous about the waiver.

11)       Mr. Galvan is of Afro-Carribean descent, born in the Dominican Republic.  He has a medical condition common among individuals of Afro-Carribean descent, but uncommon among those of hispanic or white descent.  This medical condition arises in part from having thick, curly Afro-Carribean facial hair and involves severe infection and irritation of the hair follicles and exacerbated by frequent shaving.

12)       Management repeatedly acted with derision and incredulity regarding Plaintiff's medical shaving waiver.

13)       Pursuant to medical advice given in Plaintiff's shaving waiver, Plaintiff was able to shave no more than once per week.

14)       Plaintiff's medical shaving waiver did not interfere with his ability to present to work well-kempt.

15)       Plaintiff made various attempts to smooth over management's incredulity regarding his medical shaving waiver, however, these attempts were unsuccessful.

16)       Management's incredulity and derision were expressed in several ways, including the following.

17)       Management refused to keep Plaintiff's medical shaving waiver on file, then later claimed to have lost the shaving waiver.

-3-
(VERIFIED) COMPLAINT

18)     So long as their was any problem found by management with the shaving waiver, Plaintiff was expected to act as though no shaving waiver was in effect until Plaintiff could locate the shaving waiver within his own paperwork.

19)     Additionally, Management demanded that Plaintiff obtain a second opinion about the need for a shaving waiver even though there was no evidence by an occupational doctor or other expert that a second opinion was appropriate.

20)     Additionally, Management refused to acknowledge a shaving waiver that was in the Spanish language.

21)     The Spanish language is frequently used at The Immigration and Customs Enforcement facility in El Centro by management, staff and detainees.

22)     Plaintiff is informed and believes that Defendants regularly accepts Spanish language medical reports from other employees.  Plaintiff is informed and believes that a 1-page medical waiver in Spanish did not really present a language comprehension problem.  Rather, the fact that the waiver was in Spanish was merely a pretext to conceal their true motive in complaining about the shaving waiver, which was insensitivity and incredulity towards this Afro-Carribean medical condition.

23)     In an effort to smooth over Defendant's unreasonable demands, Plaintiff thereafter obtained a shaving waiver in English.  However, this did not end his problems regarding the shaving waiver.

24)     Management's continuing harassment over the shaving waiver included calling Plaintiff away from his duties so that his facial hair growth could be inspected, scrutinized, and discussed in front of him by his superiors.  These inspections were sometimes demanded as frequently as every 3 days.

25)     Management also demanded that Plaintiff use certain over-the-counter remedies

-4-

(VERIFIED) COMPLAINT

for his condition capriciously selected by the manager and not recommended by any doctor.

26)     Management persisted in its demands that Plaintiff use these over-the-counter remedies even after Plaintiff explained that he was concerned these over-the-counter remedies were medically unproven and could cause him pain and skin irritation.

27)     On or about August 2011, Plaintiff was threatened with administrative leave due to alleged problems with his shaving waiver. A Union Grievance was required to return him to work.

28)     During the time that Defendants were growing increasingly upset about the fact that Plaintiff needed to be excused from shaving more than one time per week, racial and national origin related tension was growing on the work site.

29)     Plaintiff complained informally to management about racially motivated comments and actions by staff and inmates, however, nothing was done.

30)     In this climate of growing racial and national origin related tension, a breakroom incident occurred on October 21, 2011, hereinafter "The Racial Epithet Incident." During this incident, a young officer Mr. Lemus hurled a racial epithet across the breakroom to another young officer, Mr. Villareal. Officer Lemus had seen that Officer Villareal had a picture of an African-American celebrity on his locker, and said "So you are a negro lover now?"

31)     Among the offensive aspects of Officer Lemus' statement was the fact that he pronounced the word "Negro" with a Spanish accent, and the Spanish language meaning of the term "Negro" has a more offensive meaning and is more akin to the "N-word" in English.

32)     Mr. Galvan stated to Officer Lemus "Do you have a problem with blacks?" Mr. Lemus then replied "You ain't even black, so why do you care? You are from the Dominican Republic."

33)     Plaintiff was upset by the cavalier attitude toward the racial epithets expressed by

-5-
(VERIFIED) COMPLAINT

both young officers, and by Mr. Lemus' denial of Mr. Galvan's Afro-Carribean heritage.

34)     Mr. Lemus apologized the next day to Plaintiff, but Plaintiff was left with an impression that both young officers failed to understand the seriousness of using this kind of epithet in the workplace.

35)     Plaintiff reported the incident that day to his supervisor, Lieutenant Parra, whom he understood was trained in informal resolution. Mr. Galvan initially told Lt. Parra that he did not urge that Officer Lemus be punished, but rather only for Officer Lemus to be strongly advised on the serious nature of his epithet so he could better understand that such epithets are not a joking matter.

36)     Over 6 days went by and Mr. Parra did not initiate informal resolution with Officer Lemus.

37)     The timeline for informal resolution of this sort is usually much shorter than six days.

38)     Plaintiff worried that informal resolution would no longer be effective since Lt. Parra had effectively forfeit the ability to demonstrate compellingly to Mr. Lemus that the matter was serious – it it were deemed serious, it would have been addressed immediately. Mr. Galvan's concern was further strengthened by the fact that Mr. Galvan had made earlier reports of racism by both staff and inmates, but received little support. Additionally, Mr. Galvan knew that he was always considered as "marked" as a problem-maker by management because of the ongoing shaving waiver issue.

39)     Considering all this, Mr. Galvan felt he had no alternative but to withdraw his request for informal resolution and submit a request for formal resolution of the Racial Epithet Incident.

40)     When Lt. Parra found out that Mr. Galvan had decided to enter a formal

-6-
(VERIFIED) COMPLAINT

complaint, he argued with Mr. Galvan about whether Mr. Galvan was allowed to do this and Mr. Galvan felt it perfectly clear that management frowned on formal requests for resolution.

41)     It was at this point in time that Mr. Galvan believes the original bias that he suffered in the eyes of management as a result of the shaving waiver, fueled by anger over the request for formal resolution of the latest racial epithet, grew to the point that his job was in danger.

42)     Mr. Galvan was ultimately terminated as a result of the investigation of the Racial Epithet Incident that he himself initiated.

43)     Instead of correcting Mr. Lemus during its investigation of the above-referenced incident, management prompted both the young officers to state whether they felt threatened by the incident.

44)     The issue of a potential threat was raised only by management's investigator, not by the alleged victims Mr. Lemus and Mr. Villareal.

45)     Despite the fact that Officer Lemus did not report the incident to management and apologized to Mr. Galvan the day after the incident, management's investigator came to the conclusion that Mr. Galvan had wronged Mr. Lemus, instead of the other way around.

46)     Other examples of bias in the investigation include that the investigator found that officer Lemus said "What's up Negro?" and made no reference to the actual comment made, which was "So you are a Negro lover now?", the celebrity photo, or the context or inflection of the comment.

47)     As a result of his termination, Plaintiff has lost wages in the estimated amount of $60,000 and continuing.

48)     Additionally, Defendants have refused to correct Plaintiff's personnel file to reflect that his termination was not for cause and was not a result of misconduct or a 'threat.' As

-7-
(VERIFIED) COMPLAINT

Exhibit B
Page 8 of 33

a result of the fact that rigorous background checks are required in Plaintiff's usual occupation of guarding and correctional work, his occupation is potentially foreclosed to him.

49)     Plaintiff has suffered worry, grief, shock, anxiety, emotional distress, and other general and special damages as a result of the loss of his job, income, and potentially his career, all in an amount according to proof and above the jurisdictional limitation of this court and the limitation for classification as an unlimited civil case.

### First Cause of Action – Race Discrimination

### (Against all Defendants)

50)     Plaintiff hereby incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

51)     At all times mentioned herein, Government Code sections 12940 et. seq. were in full force and effect and were binding on Defendants. These sections require Defendants to refrain from discriminating against any employee on the basis of Race, among other personal characteristics. Within the time provided by law, Plaintiff filed his complaint with the California Department of Fair Employment and Housing, in full compliance with these sections, and received a right-to-sue letter.

52)     During the course of Plaintiff's employment, Defendants discriminated against Plaintiff based on his race – Black/Afro-Carribean.

53)     The race discrimination included failing to adequately address racial epithets in the workplace, and ultimately using the final Racial Epithet Incident as a pretext to terminate Plaintiff.

54)     Such failures by Defendants amounted to ratification of racially motivated words and conduct of the others involved.

55)     The race discrimination also included expressing prolonged derision and

-8-
(VERIFIED) COMPLAINT

incredulity towards Plaintiff's Afro-Carribean related medical condition.   Were this condition equally prevalent in other races, Plaintiff is informed and believes that his request for the minor accommodation of reduced shaving frequency would have been handled with greater objectivity by Defendants.

56)   The investigation leading to Plaintiff's termination was a pretext designed to conceal Defendant's practice of discriminating against Plaintiff on the basis of his race in the form of derision and incredulity towards his Afro-Carribean medical condition.

57)   Plaintiff believes and thereupon alleges that his race was a factor in Defendant's discrimination of him/her, and Defendant Company's unwillingness to resolve the hostile work environment created by this discrimination.  Such discrimination is in violation of Government Code section 12940 et. seq. and has resulted in damage and injury to Plaintiff as alleged herein.

58)   As a direct, foreseeable and proximate result of the aforementioned conduct by Defendants, and each of them, Plaintiff has suffered, and continues to suffer, losses in earnings, earning capacity and other benefits of employment, all in an amount which has not yet been duly ascertained.  Plaintiff will, therefore, seek leave of court and amend this complaint to allege the exact amount of such damages when the same shall become known to him, or to conform to proof thereof at trial.

59)   As a proximate result of Defendant's willful, knowing and intentional discrimination against Plaintiff, he has suffered and continue to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

60)   Plaintiff is informed and believes, and thereupon alleges, that the actions of Defendants, and each of them, as herein above alleged, were willful, wanton, malicious and oppressive, and done with knowledge that their conduct was unlawful, at least to the extent that

-9.
(VERIFIED) COMPLAINT

willful, wanton, and malicious motives of the staff can be imputed to Defendents through the doctrine of respondeat superior. Notwithstanding such knowledge, Defendants, and each of them, despicably subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiffs' rights as herein above alleged. Plaintiff is, therefore, entitled to punitive and exemplary damages in such amount as may abide the discretion of the trier of fact..

61)     Plaintiff is informed and believes, and thereupon alleges, that Defendants engaged in other actionable conduct not enumerated in this complaint. Plaintiff will, therefore, seek leave of court and amend this complaint to allege the specific acts when the same shall become known to him, or to conform to proof thereof at trial.

62)     As a result of Defendant's discriminatory acts as alleged herein, plaintiff has no plain, adequate or complete remedy at law. Therefore, plaintiff requests that he be made whole and afforded all benefits attendant thereto that would have been afforded plaintiff but for said discrimination.

### Second Cause of Action – Harassment Based on Race

63)     Plaintiff hereby incorporates the allegations of the foregoing paragraphs as if fully set forth herein and alleges a separate and distinct cause of action for Harassment Based on Race.

64)     At all times mentioned herein, Government Code sections 12940 et. seq. were in full force and effect and were binding on Defendants. These sections require Defendants to refrain from harassing any employee on the basis of Race, among other personal characteristics. Within the time provided by law, Plaintiff filed his complaint with the California Department of Fair Employment and Housing, in full compliance with these sections, and received a right-to-sue letter.

65)     During the course of Plaintiff's employment, Defendants harassed against Plaintiff based on his race – Black/Afro-Carribean.

-10-
(VERIFIED) COMPLAINT

66) The race harassment also included failing to adequately address racial epithets in the workplace, and ultimately using the final Racial Epithet Incident as a pretext to terminate Plaintiff.

67) Such failures by Defendants amounted to ratification of racially motivated words and conduct of the others involved.

68) The race discrimination also included expressing prolonged derision and incredulity towards Plaintiff's Afro-Carribean related medical condition. Such derision included calling Plaintiff in to have his facial hair growth inspected, scrutinized, and discussed in front of him by his superiors – in some cases as frequently as once every 3 days. Were this condition equally prevalent in other races, Plaintiff is informed and believes that his request for the minor accommodation of reduced shaving frequency would have been handled with greater objectivity by Defendants.

69) The investigation leading to Plaintiff's termination was a pretext designed to conceal Defendant's practice of discriminating against Plaintiff on the basis of his race in the form of derision and incredulity towards his Afro-Carribean medical condition.

70) Plaintiff believes and thereupon alleges that his race was a factor in Defendant's discrimination of him/her, and Defendant Company's unwillingness to resolve the hostile work environment created by this discrimination. Such discrimination is in violation of Government Code section 12940 et. seq. and has resulted in damage and injury to Plaintiff as alleged herein.

71) As a direct, foreseeable and proximate result of the aforementioned conduct by Defendants, and each of them, Plaintiff has suffered, and continues to suffer, losses in earnings, earning capacity and other benefits of employment, all in an amount which has not yet been duly ascertained. Plaintiff will, therefore, seek leave of court and amend this complaint to allege the exact amount of such damages when the same shall become known to him, or to conform to

-11-
(VERIFIED) COMPLAINT

proof thereof at trial.

72)     As a proximate result of Defendant's willful, knowing and intentional discrimination against Plaintiff, he has suffered and continue to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

73)     Plaintiff is informed and believes, and thereupon alleges, that the actions of Defendants, and each of them, as herein above alleged, were willful, wanton, malicious and oppressive, and done with knowledge that their conduct was unlawful, at least to the extent that willful, wanton, and malicious motives of the staff can be imputed to Defendents through the doctrine of respondeat superior. Notwithstanding such knowledge, Defendants, and each of them, despicably subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiffs' rights as herein above alleged.  Plaintiff is, therefore, entitled to punitive and exemplary damages in such amount as may abide the discretion of the trier of fact.

74)     Plaintiff is informed and believes, and thereupon alleges, that Defendants engaged in other actionable conduct not enumerated in this complaint.  Plaintiff will, therefore, seek leave of court and amend this complaint to allege the specific acts when the same shall become known to her, or to conform to proof thereof at trial.

75)     As a result of Defendant's discriminatory acts as alleged herein, plaintiff has no plain, adequate or complete remedy at law.   Therefore, plaintiff requests that she be made whole and afforded all benefits attendant thereto that would have been afforded plaintiff but for said discrimination.

<u>Third Cause of Action – National Origin Discrimination</u>
<u>(Against All Defendants)</u>

76)     Plaintiff hereby incorporates the allegations of the foregoing paragraphs as if

-12-
(VERIFIED) COMPLAINT

fully set forth herein and alleges a separate and distinct cause of action for National Origin Discrimination.

77)     At all times mentioned herein, Government Code sections 12940 et. seq. were in full force and effect and were binding on Defendants. These sections require Defendants to refrain from discriminating against any employee on the basis of National Origin, among other personal characteristics. Within the time provided by law, Plaintiff filed his complaint with the California Department of Fair Employment and Housing, in full compliance with these sections, and received a right-to-sue letter.

78)     During the course of Plaintiff's employment, Defendants discriminated against Plaintiff based on his national origin – Dominican Republic.

79)     The national origin discrimination included failing to adequately address racial epithets in the workplace, and ultimately using the final Racial Epithet Incident as a pretext to terminate Plaintiff.

80)     National origin figured in to all of the racial epithets and conduct of which Plaintiff complained. Plaintiff's national origin was apparent in part because he spoke a different dialect of Spanish than the majority of the other management, staff, and detainees. Plaintiff was treated as an outsider by management and staff as a result of his National origin.

81)     As demonstrated for instance by Officer Lemus' comment "You ain't even black, so why do you care? You are from the Dominican Republic" during the Racial Epithet incident, national origin figured into the animus that Plaintiff experienced from staff and management.

82)     Failures by Defendants to adequately address the racial and national origin related tensions in the workplace amounted to ratification the words and conduct of the others involved. National origin was a factor in the motivation of these words and conduct.

83)     Plaintiff believes and thereupon alleges that his national origin was a factor in

-13-
(VERIFIED) COMPLAINT

Defendant's discrimination of him/her, and Defendant Company's unwillingness to resolve the hostile work environment created by this discrimination.  Such discrimination is in violation of Government Code section 12940 et. seq. and has resulted in damage and injury to Plaintiff as alleged herein.

84)     As a direct, foreseeable and proximate result of the aforementioned conduct by Defendants, and each of them, Plaintiff has suffered, and continues to suffer, losses in earnings, earning capacity and other benefits of employment, all in an amount which has not yet been duly ascertained.  Plaintiff will, therefore, seek leave of court and amend this complaint to allege the exact amount of such damages when the same shall become known to him, or to conform to proof thereof at trial.

85)     As a proximate result of Defendant's willful, knowing and intentional discrimination against Plaintiff, he has suffered and continue to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

86)     Plaintiff is informed and believes, and thereupon alleges, that the actions of Defendants, and each of them, as herein above alleged, were willful, wanton, malicious and oppressive, and done with knowledge that their conduct was unlawful, at least to the extent that willful, wanton, and malicious motives of the staff can be imputed to Defendants through the doctrine of respondeat superior. Notwithstanding such knowledge, Defendants, and each of them, despicably subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiffs' rights as herein above alleged.  Plaintiff is, therefore, entitled to punitive and exemplary damages in such amount as may abide the discretion of the trier of fact.

87)     Plaintiff is informed and believes, and thereupon alleges, that Defendants engaged in other actionable conduct not enumerated in this complaint.  Plaintiff will, therefore, seek leave

-14-
(VERIFIED) COMPLAINT

of court and amend this complaint to allege the specific acts when the same shall become known to her, or to conform to proof thereof at trial.

88)     As a result of Defendant's discriminatory acts as alleged herein, plaintiff has no plain, adequate or complete remedy at law.   Therefore, plaintiff requests that she be made whole and afforded all benefits attendant thereto that would have been afforded plaintiff but for said discrimination.

### Fourth Cause of Action – Disability Discrimination
### (Against all Defendants)

89)     Plaintiff hereby incorporates the allegations of the foregoing paragraphs as if fully set forth herein and alleges a separate and distinct cause of action for Disability Discrimination..

90)     At all times mentioned herein, Government Code sections 12940 et. seq. were in full force and effect and were binding on Defendants.  These sections require Defendants to refrain from discriminating against any employee on the basis of National Origin, among other personal characteristics.  Within the time provided by law, Plaintiff filed his complaint with the California Department of Fair Employment and Housing, in full compliance with these sections, and received a right-to-sue letter.

91)     During the course of Plaintiff's employment, Defendants discriminated against Plaintiff based on his national origin – Dominican Republic.

92)     The national origin discrimination included failing to adequately address racial epithets in the workplace, and ultimately using the final Racial Epithet Incident as a pretext to terminate Plaintiff.

93).     National origin figured in to all of the racial epithets and conduct of which Plaintiff complained.  Plaintiff's national origin was apparent in part because he spoke a different

-15-
(VERIFIED) COMPLAINT

dialect of Spanish than the majority of the other management, staff, and detainees.  Plaintiff was

treated as an outsider by management and staff as a result of his National origin.

94)   .   As demonstrated for instance by Officer Lemus' comment "You ain't even black, so why do you care? You are from the Dominican Republic" during the Racial Epithet incident, national origin figured into the animus that Plaintiff experienced from staff and management.

95)   Failures by Defendants to adequately address the racial and national origin related tensions in the workplace amounted to ratification the words and conduct of the others involved.  National origin was a factor in the motivation of these words and conduct.

96)   Plaintiff believes and thereupon alleges that his national origin was a factor in Defendant's discrimination of him/her, and Defendant Company's unwillingness to resolve the hostile work environment created by this discrimination.  Such discrimination is in violation of Government Code section 12940 et. seq. and has resulted in damage and injury to Plaintiff as alleged herein.

97)   As a direct, foreseeable and proximate result of the aforementioned conduct by Defendants, and each of them, Plaintiff has suffered, and continues to suffer, losses in earnings, earning capacity and other benefits of employment, all in an amount which has not yet been duly ascertained.  Plaintiff will, therefore, seek leave of court and amend this complaint to allege the exact amount of such damages when the same shall become known to him, or to conform to proof thereof at trial.

98)   As a proximate result of Defendant's willful, knowing and intentional discrimination against Plaintiff, he has suffered and continue to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

99)   Plaintiff is informed and believes, and thereupon alleges, that the actions of

-16-
(VERIFIED) COMPLAINT

Defendants, and each of them, as herein above alleged, were willful, wanton, malicious and oppressive, and done with knowledge that their conduct was unlawful, at least to the extent that willful, wanton, and malicious motives of the staff can be imputed to Defendants through the doctrine of respondeat superior. Notwithstanding such knowledge, Defendants, and each of them, despicably subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiffs' rights as herein above alleged. Plaintiff is, therefore, entitled to punitive and exemplary damages in such amount as may abide the discretion of the trier of fact.

100)   Plaintiff is informed and believes, and thereupon alleges, that Defendants engaged in other actionable conduct not enumerated in this complaint. Plaintiff will, therefore, seek leave of court and amend this complaint to allege the specific acts when the same shall become known to her, or to conform to proof thereof at trial.

101)   As a result of Defendant's discriminatory acts as alleged herein, plaintiff has no plain, adequate or complete remedy at law.   Therefore, plaintiff requests that she be made whole and afforded all benefits attendant thereto that would have been afforded plaintiff but for said discrimination.

### Fifth Cause of Action – Disability Harassment

### (Against All Defendants)

102)   Plaintiff hereby incorporates the allegations of the foregoing paragraphs as if fully set forth herein and alleges a separate and distinct cause of action for National Origin Discrimination.

103)   At all times mentioned herein, Government Code sections 12940 et. seq.  were in full force and effect and were binding on Defendants. These sections require Defendants to refrain from discriminating against any employee on the basis of a medical Disability, among other personal characteristics. Within the time provided by law, Plaintiff filed his complaint with

-17-
(VERIFIED) COMPLAINT

the California Department of Fair Employment and Housing, in full compliance with these sections, and received a right-to-sue letter.

104) During the course of Plaintiff's employment, Defendants discriminated against Plaintiff based on his skin condition.

105) Plaintiff's skin condition is a substantial disability in that shaving too frequently can cause severe redness, inflammation, infection, pustules, etc. on the neck and face.

106) Within the context of Plaintiff's occupation, Plaintiff's skin condition was a substantial disability because it threatened to interfere with Plaintiff's ability to present to work in a well-kempt manner. Appearing to work as in a well-kempt fashion is important in the context of being a guard of federal detainees because the total relationship between detainees and guard staff is enhanced when the guard staff is overall well-kempt.

107) Shaving more frequently than recommended by the doctor could cause severe skin reactions visible to the detainees that might make Plaintiff appear weak, sick, or unkempt, thus adversely effecting their respect for his authority.

108) Having a well-kempt short beard during certain times of the week in order to comply with medical advice, by contrast, did not interfere with the total relationship between the guard staff and detainees.

109) As alleged herein, Defendants refused to honor Plaintiff's medical shaving waiver and instead launched a campaign of discrimination and retaliation against him.

110) Plaintiff believes and thereupon alleges that his skin condition was a factor in Defendant's discrimination against him. Such discrimination is in violation of Government Code section 12940 et. seq. and has resulted in damage and injury to Plaintiff as alleged herein.

111) As a direct, foreseeable and proximate result of the aforementioned conduct by Defendants, and each of them, Plaintiff has suffered, and continues to suffer, losses in earnings,

-18-
(VERIFIED) COMPLAINT

earning capacity and other benefits of employment, all in an amount which has not yet been duly ascertained. Plaintiff will, therefore, seek leave of court and amend this complaint to allege the exact amount of such damages when the same shall become known to him, or to conform to proof thereof at trial.

112)   As a proximate result of Defendant's willful, knowing and intentional discrimination against Plaintiff, he has suffered and continue to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

113)   Plaintiff is informed and believes, and thereupon alleges, that the actions of Defendants, and each of them, as herein above alleged, were willful, wanton, malicious and oppressive, and done with knowledge that their conduct was unlawful, at least to the extent that willful, wanton, and malicious motives of the staff can be imputed to Defendents through the doctrine of respondeat superior. Notwithstanding such knowledge, Defendants, and each of them, despicably subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiffs' rights as herein above alleged. Plaintiff is, therefore, entitled to punitive and exemplary damages in such amount as may abide the discretion of the trier of fact.

114)   Plaintiff is informed and believes, and thereupon alleges, that Defendants engaged in other actionable conduct not enumerated in this complaint. Plaintiff will, therefore, seek leave of court and amend this complaint to allege the specific acts when the same shall become known to her, or to conform to proof thereof at trial.

115)   As a result of Defendant's discriminatory acts as alleged herein, plaintiff has no plain, adequate or complete remedy at law. Therefore, plaintiff requests that she be made whole and afforded all benefits attendant thereto that would have been afforded plaintiff but for said discrimination.

-19-
(VERIFIED) COMPLAINT

## Sixth Cause of Action – Disability Harassment

116)    Plaintiff hereby incorporates the allegations of the foregoing paragraphs as if fully set forth herein and alleges a separate and distinct cause of action for Harassment based on Disability.

117)    At all times mentioned herein, Government Code sections 12940 et. seq. were in full force and effect and were binding on Defendants. These sections require Defendants to refrain from discriminating against any employee on the basis of a medical Disability, among other personal characteristics. Within the time provided by law, Plaintiff filed his complaint with the California Department of Fair Employment and Housing, in full compliance with these sections, and received a right-to-sue letter.

118)    During the course of Plaintiff's employment, Defendants harrassed Plaintiff based on his skin condition as more fully set forth in the section above on Race Harassment.

119)    Plaintiff's skin condition is a substantial disability in that shaving too frequently can cause severe redness, inflammation, infection, pustules, etc. on the neck and face.

120)    Within the context of Plaintiff's occupation, Plaintiff's skin condition was a substantial disability because it threatened to interfere with Plaintiff's ability to present to work in a well-kempt manner. Appearing to work as in a well-kempt fashion is important in the context of being a guard of federal detainees because the total relationship between detainees and guard staff is enhanced when the guard staff is overall well-kempt.

121)    Shaving more frequently than recommended by the doctor could cause severe skin reactions visible to the detainees that might make Plaintiff appear weak, sick, or unkempt, thus adversely effecting their respect for his authority.

122)    Having a well-kempt short beard during certain times of the week in order to comply with medical advice, by contrast, did not interfere with the total relationship between the

-20-
(VERIFIED) COMPLAINT

guard staff and detainees.

123) As alleged herein, Defendants refused to honor Plaintiff's medical shaving waiver and instead launched a campaign of harassment, discrimination and retaliation against him.

124) Plaintiff believes and thereupon alleges that his skin condition was a factor in Defendant's discrimination against him. Such discrimination is in violation of Government Code section 12940 et. seq. and has resulted in damage and injury to Plaintiff as alleged herein.

125) As a direct, foreseeable and proximate result of the aforementioned conduct by Defendants, and each of them, Plaintiff has suffered, and continues to suffer, losses in earnings, earning capacity and other benefits of employment, all in an amount which has not yet been duly ascertained. Plaintiff will, therefore, seek leave of court and amend this complaint to allege the exact amount of such damages when the same shall become known to him, or to conform to proof thereof at trial.

126) As a proximate result of Defendant's willful, knowing and intentional discrimination against Plaintiff, he has suffered and continue to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

127) Plaintiff is informed and believes, and thereupon alleges, that the actions of Defendants, and each of them, as herein above alleged, were willful, wanton, malicious and oppressive, and done with knowledge that their conduct was unlawful, at least to the extent that willful, wanton, and malicious motives of the staff can be imputed to Defendants through the doctrine of respondeat superior. Notwithstanding such knowledge, Defendants, and each of them, despicably subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiffs' rights as herein above alleged. Plaintiff is, therefore, entitled to punitive and exemplary damages in such amount as may abide the discretion of the trier of fact.

-21-
(VERIFIED) COMPLAINT

can cause severe redness, inflammation, infection, pustules, etc. on the neck and face.

135)   Within the context of Plaintiff's occupation, Plaintiff's skin condition was a substantial disability because it threatened to interfere with Plaintiff's ability to present to work in a well-kempt manner. Appearing to work as in a well-kempt fashion is important in the context of being a guard of federal detainees because the total relationship between detainees and guard staff is enhanced when the guard staff is overall well-kempt.

136)   Shaving more frequently than recommended by the doctor could cause severe skin reactions visible to the detainees that might make Plaintiff appear weak, sick, or unkempt, thus adversely effecting their respect for his authority.

137)   Having a well-kempt short beard during certain times of the week in order to comply with medical advice, by contrast, did not interfere with the total relationship between the guard staff and detainees.

138)   As alleged herein, Defendants refused to honor Plaintiff's medical shaving waiver and instead launched a campaign of harassment, discrimination and retaliation against him.

139)   Plaintiff believes and thereupon alleges that his skin condition was a factor in Defendant's discrimination against him. Such discrimination is in violation of Government Code section 12940 et. seq. and has resulted in damage and injury to Plaintiff as alleged herein.

140)   As a direct, foreseeable and proximate result of the aforementioned conduct by Defendants, and each of them, Plaintiff has suffered, and continues to suffer, losses in earnings, earning capacity and other benefits of employment, all in an amount which has not yet been duly ascertained. Plaintiff will, therefore, seek leave of court and amend this complaint to allege the exact amount of such damages when the same shall become known to him, or to conform to proof thereof at trial.

141)   As a proximate result of Defendant's willful, knowing and intentional

-23-
(VERIFIED) COMPLAINT

discrimination against Plaintiff, he has suffered and continue to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

142)   Plaintiff is informed and believes, and thereupon alleges, that the actions of Defendants, and each of them, as herein above alleged, were willful, wanton, malicious and oppressive, and done with knowledge that their conduct was unlawful, at least to the extent that willful, wanton, and malicious motives of the staff can be imputed to Defendants through the doctrine of respondeat superior. Notwithstanding such knowledge, Defendants, and each of them, despicably subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiffs' rights as herein above alleged. Plaintiff is, therefore, entitled to punitive and exemplary damages in such amount as may abide the discretion of the trier of fact.

143)   Plaintiff is informed and believes, and thereupon alleges, that Defendants engaged in other actionable conduct not enumerated in this complaint. Plaintiff will, therefore, seek leave of court and amend this complaint to allege the specific acts when the same shall become known to him, or to conform to proof thereof at trial.

144)   As a result of Defendant's discriminatory acts as alleged herein, Plaintiff has no plain, adequate or complete remedy at law.   Therefore, Plaintiff requests that he be made whole and afforded all benefits attendant thereto that would have been afforded plaintiff but for said discrimination.

**Eighth Cause of Action – Retaliation for Exercise of FMLA Rights**

145)   Plaintiff hereby incorporates the allegations of the foregoing paragraphs as if fully set forth herein, and alleges as a separate and distinct cause of action Retaliation for Exercise of FMLA Rights.

146)   Plaintiff was on FMLA leave immediately prior to his termination on or about

-24-
(VERIFIED) COMPLAINT

November 11, 2011.

147)     For this period of leave, Plaintiff's request was initially denied. A Union grievance was required in order for Plaintiff's need for FMLA leave to be approved.

148)     Plaintiff is thus informed and believes that his insistence on FMLA leave was a factor in management's decision to terminate him, in addition to the aforementioned factors.

149)     As a direct, foreseeable and proximate result of the aforementioned conduct by Defendants, and each of them, Plaintiff has suffered, and continues to suffer, losses in earnings, earning capacity and other benefits of employment, all in an amount which has not yet been duly ascertained. Plaintiff will, therefore, seek leave of court and amend this complaint to allege the exact amount of such damages when the same shall become known to him, or to conform to proof thereof at trial.

150)     As a proximate result of Defendant's willful, knowing and intentional discrimination against Plaintiff, he has suffered and continue to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

151)     Plaintiff is informed and believes, and thereupon alleges, that the actions of Defendants, and each of them, as herein above alleged, were willful, wanton, malicious and oppressive, and done with knowledge that their conduct was unlawful, at least to the extent that willful, wanton, and malicious motives of the staff can be imputed to Defendants through the doctrine of respondeat superior. Notwithstanding such knowledge, Defendants, and each of them, despicably subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiffs' rights as herein above alleged. Plaintiff is, therefore, entitled to punitive and exemplary damages in such amount as may abide the discretion of the trier of fact.

152)     Plaintiff is informed and believes, and thereupon alleges, that Defendants engaged

-25-
(VERIFIED) COMPLAINT

in other actionable conduct not enumerated in this complaint.  Plaintiff will, therefore, seek leave

of court and amend this complaint to allege the specific acts when the same shall become known

to him, or to conform to proof thereof at trial.

### Ninth Cause of Action – Termination in Violation of Public Policy

153)    By terminating Plaintiff due race, national origin, and in retaliation for his

complaints about discrimination and his exercise of FMLA rights Defendant violated

fundamental public policies against race discrimination, national origin discrimination, and

retaliation.

154)    As a proximate result of said discrimination, Plaintiff has suffered and continues

to suffer substantial losses in earning, bonuses, and other employment benefits which he would

have received had Defendant not breached said agreement, plus expenses incurred in obtaining

substitute employment, all to her damage in amount according to proof.

155)    As a proximate result of Defendants' willful, knowing and intentional

discrimination against Plaintiff has suffered and continue to suffer humiliation, emotional

distress, and mental and physical pain and anguish, all to her damage in a sum according to

proof.

156)    Plaintiff is informed and believes, and thereupon alleges that Defendant

Company's acts as herein above alleged, were willful, wanton, malicious and oppressive, and

done with knowledge that her conduct was unlawful.  Notwithstanding such knowledge,

Defendant Company despicably subjected Plaintiff to cruel and unjust hardship in conscious

disregard of Plaintiff's rights.  Plaintiff is, therefore, entitled to punitive and exemplary damages

in such amount as may abide the discretion of the trier of fact.

-26-
(VERIFIED) COMPLAINT

1
2
3      ///
4      WHEREFORE, Plaintiff respectfully requests:
5
6          FOR THE FIRST CAUSE OF ACTION:  For compensatory damages including lost
7      wages, lost employee benefits, bonuses, vacation benefits, sick pay, and other special and general
8      damages on all causes of action; For an award of interest, including prejudgment interest, at the
9      legal rate; for correction of Plaintiff's personnel file, For an award to Plaintiff of attorneys fees
10     and costs of suit incurred herein and; For such other and further relief as the court may deem just
11     and proper under the circumstances.
12
13         FOR THE SECOND CAUSE OF ACTION:  For compensatory damages including lost
14     wages, lost employee benefits, bonuses, vacation benefits, sick pay, and other special and general
15     damages on all causes of action; For an award of interest, including prejudgment interest, at the
16     legal rate; for correction of Plaintiff's personnel file, For an award to Plaintiff of attorneys fees
17     and costs of suit incurred herein and; For such other and further relief as the court may deem just
18     and proper under the circumstances.
19
20         FOR THE THIRD CAUSE OF ACTION:  For compensatory damages including lost
21     wages, lost employee benefits, bonuses, vacation benefits, sick pay, and other special and general
22     damages on all causes of action; For an award of interest, including prejudgment interest, at the
23     legal rate; for correction of Plaintiff's personnel file, For an award to Plaintiff of attorneys fees
24     and costs of suit incurred herein and; For such other and further relief as the court may deem just
25     and proper under the circumstances.
26
27         FOR THE FOURTH CAUSE OF ACTION: For compensatory damages including lost
28

-27-
(VERIFIED) COMPLAINT

1  wages, lost employee benefits, bonuses, vacation benefits, sick pay, and other special and general

2  damages on all causes of action; For an award of interest, including prejudgment interest, at the

3  legal rate; for correction of Plaintiff's personnel file, For an award to Plaintiff of attorneys fees

4  and costs of suit incurred herein and; For such other and further relief as the court may deem just

5  and proper under the circumstances.

6          FOR THE FIFTH CAUSE OF ACTION:  For compensatory damages including lost

7  wages, lost employee benefits, bonuses, vacation benefits, sick pay, and other special and general

8  damages on all causes of action; For an award of interest, including prejudgment interest, at the

9  legal rate; for correction of Plaintiff's personnel file, For an award to Plaintiff of attorneys fees

10 and costs of suit incurred herein and; For such other and further relief as the court may deem just

11 and proper under the circumstances.

12

13         FOR THE SIXTH CAUSE OF ACTION:  For compensatory damages including lost

14 wages, lost employee benefits, bonuses, vacation benefits, sick pay, and other special and general

15 damages on all causes of action; For an award of interest, including prejudgment interest, at the

16 legal rate; for correction of Plaintiff's personnel file, For an award to Plaintiff of attorneys fees

17 and costs of suit incurred herein and; For such other and further relief as the court may deem just

18 and proper under the circumstances.

19

20         FOR THE SEVENTH CAUSE OF ACTION:  For compensatory damages including

21 lost wages, lost employee benefits, bonuses, vacation benefits, sick pay, and other special and

22 general damages on all causes of action; For an award of interest, including prejudgment interest,

23 at the legal rate; for correction of Plaintiff's personnel file, For an award to Plaintiff of attorneys

24 fees and costs of suit incurred herein and; For such other and further relief as the court may deem

25 just and proper under the circumstances.

26         FOR THE EIGHTH CAUSE OF ACTION:  For compensatory damages including lost

27

28

-28-
(VERIFIED) COMPLAINT

wages, lost employee benefits, bonuses, vacation benefits, sick pay, and other special and general damages on all causes of action; For an award of interest, including prejudgment interest, at the legal rate; for correction of Plaintiff's personnel file, For an award to Plaintiff of attorneys fees and costs of suit incurred herein and; For such other and further relief as the court may deem just and proper under the circumstances.

FOR THE NINTH CAUSE OF ACTION:  For compensatory damages including lost wages, lost employee benefits, bonuses, vacation benefits, sick pay, and other special and general damages on all causes of action; For an award of interest, including prejudgment interest, at the legal rate; for correction of Plaintiff's personnel file, For an award to Plaintiff of attorneys fees and costs of suit incurred herein and; For such other and further relief as the court may deem just and proper under the circumstances.

Respectfully submitted this 27 day of May, 2013

CRESS LAW FIRM

Adrian Cress
Attorney for Plaintiff

-29-
(VERIFIED) COMPLAINT

<u>Verification</u>

I, Jose Galvan, have read the foregoing Complaint and know the contents therein.  The matters stated therein are true of my own knowledge except as to those matters stated on information and belief, namely paragraphs 2, 3, 4, 22, 5, 55, 60, 61, 68, 73, 74, 86, 87, 99, 200, 113, 114, 127, 128, 142, 143.  As to those matters stated on information and belief, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 6-1-13

Jose Galvan

30.
(VERIFIED) COMPLAINT

1    Adrian Cress, Esq. SBN 264549
     CRESS LAW FIRM
2    2425 Fifth Ave., Ste. 330
     San Diego, CA 92101
3    Phone: (619) 393-2126
     Fax: (619) 393-2127
4    Email: acress@cresslawfirm.com

5

6    Attorney for Plaintiff JOSE GALVAN

7

8

9
                    SUPERIOR COURT OF THE STATE OF CALIFORNA
10
                         COUNTY OF IMPERIAL
11

12   JOSE GALVAN, an individual          Case No.: ECU07733

13            Plaintiffs,                 DOE AMENDMENT IN ACCORDANCE
                                          WITH CCP § 474
14        vs.
                                          Case Filed:   7/1/13
15                                        Department:    9
                                          Judge:        Hon. Juan Ulloa
16                                        Trial Date:    Not Set

17   ASSET PROTECTION & SECURITY
     SERVICES, LP; AHTNA TECHNICAL
18   SERVICES, INC; and DOES 1-45

19

20

21

22

23

24

25

26

27

28

                                      -1-
                           DOE AMENDMENT CCP 474

                                                      Exhibit B
                                                      Page 31 of 33

TO: The court, the parties, and their attorneys of record:  PLEASE BE ADVISED that Plaintiff, being ignorant of the true name of a defendant when the complaint in the above-named case was filed, and having designated defendant in the complaint by the fictitious name of DOE 1, and having discovered the true name of the defendant to be:

APSS MANAGEMENT LLC, (as general partner of "Asset Protection & Security Services LP", a Texas organization doing business in the county of Imperial, State of California under the fictitious business name of "Asset Security Services, LP.")

Amends the complaint by inserting such true name in place of such fictitious name wherever it appears in the complaint.

Respectfully submitted this 22nd day of August, 2013

CRESS LAW FIRM

Adrian Cress
Attorney for Plaintiff

-2-
DOE AMENDMENT CCP 474

| SUPERIOR COURT OF STATE OF CALIFORNIA<br>COUNTY OF IMPERIAL | ENDORSED |
|---|---|
| **Plaintiff/Petitioner**<br>JOSE GALVAN,<br><br>vs.<br><br>ASSET PROTECTION & SECURITY SERVICES, LP; ET AL<br>Defendant/Respondent | JUL 0 8 2013<br>SUPERIOR COURT<br>COUNTY OF IMPERIAL<br>KRISTINE S. KUSSMAN, CLERK<br>BY ROSA DORAME, DEPUTY<br>Rosa Dorame |
| **NOTICE OF CASE MANAGEMENT CONFERENCE** | **CASE NO.** *ECU07733* |

1. NOTICE is given that a CASE MANAGEMENT CONFERENCE has been scheduled as follows:

| Date: 01/06/14 | Time: 8:30 a.m. | Dept.:9 |
|---|---|---|

Address of Court:  Imperial County Courthouse, 939 West Main Street, El Centro, CA 92243

2. You must file and serve a completed Case Management Conference Statement at least fifteen (15) days before the case management conference.

3. You must be familiar with the case and be fully prepared to participate effectively in the case management conference.

4. At the case management conference the court may make pretrial orders, including the following:

   a) An order establishing a discovery schedule.

   b) An order referring the case to arbitration.

   c) An order dismissing fictitious defendants.

   d) An order scheduling exchange of expert witness information.

   e) An order setting subsequent conferences and the trial date.

   f) Other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code § 68600 et seq.).

5. Parties wishing to appear by telephone must comply with CRC 3.670 and local Rule 10.07.

**DATED: 07/08/13**

Kristine Kussman, Clerk by _____, Deputy

*Rosa Dorame*

**--SANCTIONS--**
If you do not file the Case Management Conference Statement required by CRC 3.725, or attend the case management conference or participate effectively in the conference, the Court may impose sanctions (including dismissal of the case, striking of the answer, and payment of money).

**NOTICE OF CASE MANAGEMENT CONFERENCE**
CRC 3.725 and Imperial County Local Rule 3.10
Government Code §68600 et seq.

ICSC  C-114 01/07

Exhibit B
Page 33 of 33

1  Sarah Jane Fischer, Bar No. 260807
   sarahfischer@perkinscoie.com
2  PERKINS COIE LLP
   1029 West Third Ave., Suite 300
3  Anchorage, Alaska  99501
   Telephone: 907.279.8561
4  Facsimile: 907.263.6427

5  Attorneys for Defendants
   AHTNA TECHNICAL SERVICES, INC.

6

7

8                  SUPERIOR COURT OF THE STATE OF CALIFORNIA
                          COUNTY OF IMPERIAL
9                         EL CENTRO DIVISION

10

11  JOSE GALVAN, an individual,          Case No. ECU07733

12              Plaintiff,               ASSIGNED FOR ALL PURPOSES TO THE
                                         HON. JUAN ULLOA,  DEPT. 9
13      v.
                                         DEFENDANT AHTNA TECHNICAL
14  ASSET PROTECTION & SECURITY          SERVICES, INC.'S ANSWER TO
    SERVICES, LP; AHTNA TECHNICAL        PLAINTIFF'S COMPLAINT
15  SERVICES, INC.;  and DOES 1-45,
                                         Complaint filed:   July 1, 2013
16              Defendants.              Trial date:        None set

17

18         Defendant AHTNA TECHNICAL SERVICES, INC. ("ATSI" or "Defendant") responds

19  to Plaintiff Jose Galvan's Complaint ("Complaint") as set forth below.

                                GENERAL DENIAL
20
21         Pursuant to California Code of Civil Procedure Section 431.30, Defendant generally and

22  specifically denies each and every allegation in the Complaint and, further, denies that Plaintiff

23  was damaged in the manner or sum alleged, or in any other manner or sum whatsoever at all.

                              AFFIRMATIVE DEFENSES
24
25         Without admitting any of the facts alleged in the Complaint, Defendant hereby asserts and

26  alleges the following separate and additional defenses, without prejudice to its right to argue that

27  Plaintiff bears the burden of proof as to any one or more of said defenses.  Furthermore, all such

28  defenses are pled in the alternative and do not constitute an admission of liability or an admission

ANSWER                                    1
74870-0029/LEGAL27900998.1

Exhibit C
Page 1 of 11

1  that Plaintiff is entitled to any relief whatsoever. Defendant reserves the right to assert any and

2  all additional affirmative defenses should Defendant become aware of any such additional

3  defenses during the course of discovery.

### FIRST AFFIRMATIVE DEFENSE
#### (Failure To State A Cause Of Action)

6  1.  Plaintiffs' Complaint, and each and every cause of action thereof, fails to state a

7  cause of action upon which relief may be granted. Plaintiff's complaint fails because, *inter alia*,

8  his state law claims are preempted by federal law under the federal enclave doctrine. The El

9  Centro Processing Center is a federal enclave and federal law, not state law, applies.

### SECOND AFFIRMATIVE DEFENSE
#### (No Nexus)

12  2.  Plaintiff's claims are barred because no nexus exists between the alleged wrongful

13  conduct, his activities, and any alleged adverse employment action.

### THIRD AFFIRMATIVE DEFENSE
#### (Outside the Course and Scope of Employment)

16  3.  Plaintiff's claims are barred to the extent that his damages, if any, were caused by

17  the alleged actions of Defendant ATSI's employees that were outside the scope of their

18  employment.

### FOURTH AFFIRMATIVE DEFENSE
#### (No Responsibility for Employees)

21  4.  Plaintiff's claims are barred because, and to the degree that, any alleged actions of

22  ATSI's employees cannot be imputed to them.

### FIFTH AFFIRMATIVE DEFENSE
#### (No Responsibility for Third Parties)

25  5.  Plaintiff's claims are barred because, and to the degree that, any alleged actions of

26  Defendant Asset Protection & Security Services cannot be imputed to ATSI.

27

1

2

### SIXTH AFFIRMATIVE DEFENSE

### (After-Acquired Evidence)

3         6.    Plaintiff's claims for damages may be barred by the doctrine of after-acquired

4    evidence. Investigation and discovery are ongoing, and Defendant reserves the right to assert and

5    amend this affirmative defense as facts are discovered or established.

6    ### SEVENTH AFFIRMATIVE DEFENSE

7    ### (Legitimate Business Reasons)

8         7.    Plaintiff's claims are barred because to the extent the conduct alleged occurred,

9    which Defendant denies, such conduct was not motivated by any protected claims or conduct by

10   Plaintiff. Defendant's actions were taken for legitimate business reasons and were not based

11   upon a violation of public policy or any other factors protected by or contrary to any applicable

12   controlling law.

13        8.    Moreover, such decisions would have been made absent consideration of any

14   alleged impermissible factor.

15        9.    Accordingly, no independent wrongful act exists.  Plaintiff's "public policy"

16   claims are barred because Defendant's decisions and actions regarding his employment were

17   based on legitimate, nondiscriminatory, non-harassing and non-retaliatory factors.

18   ### EIGHTH AFFIRMATIVE DEFENSE

19   ### (Contribution)

20        10.    Plaintiff contributed to or caused his own damages, if any, by virtue of his own

21   actions, negligence, and/or misconduct.

22   ### NINTH AFFIRMATIVE DEFENSE

23   ### (Lack of Knowledge)

24        11.    Plaintiff's purported causes of action for retaliation and wrongful termination in

25   violation of the Fair Employment and Housing Act are barred, and any recovery of damages is

26   precluded, because Defendant lacked knowledge that Plaintiff was subject to retaliation (if any).

27

## TENTH AFFIRMATIVE DEFENSE

### (Exclusive Remedy for Personal Injuries)

12.     Plaintiff's claims for purported physical or emotional injuries allegedly suffered during or as a result of his employment are barred, in whole or in part, because Plaintiff's sole and exclusive remedies, if any, lie under the California Workers' Compensation Act.  Cal. Lab. Code § 3601-3602.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

13.     Plaintiff asserts that he has suffered damages as a result of Defendant's alleged conduct.

14.     Even if Plaintiff was entitled to recover from Defendant for any damages flowing from Defendant's alleged conduct, such damages would be reduced to the degree Plaintiff has been able to mitigate such damages. Further, even if Plaintiff was entitled to recover from Defendant for any damages flowing from Defendant's alleged conduct, such damages would be reduced to the degree Plaintiff could have mitigated his damages, but failed to do so. In this regard, Defendant asserts the doctrine of avoidable consequences as a bar or limit to recovery by Plaintiff.

15.     Defendant is informed and believes that Plaintiff has not sought or obtained new employment with the diligence that he could and should have displayed. Accordingly, the amount of damages to which Plaintiff may be entitled, if any, should be reduced by the amount of damages that were, or that could and should otherwise have been reasonably mitigated.

## TWELFTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

16.     Defendant is informed and believes that each purported claim and cause of action alleged in the Complaint is barred in whole or in part by the applicable statute of limitations, including without limitation California Code of Civil Procedure Sections 335.1, 337, 338(a), 340(a) and/or (b), California Government Code Section 12960 and 12965, and California Labor Code Section 98.7.

ANSWER
74870-0029/LEGAL27900998.1

4

Exhibit C
Page 4 of 11

## THIRTEENTH AFFIRMATIVE DEFENSE
### (Statute of Limitations)

17.    Defendant is informed and believes that each purported claim and cause of action alleged in the Complaint is barred in whole or in part by the applicable statute of limitations, including without limitation California Code of Civil Procedure Sections 335.1, 337, 338(a), 340(a) and/or (b), California Government Code Section 12960 and 12965, and California Labor Code Section 98.7.

## FOURTEENTH AFFIRMATIVE DEFENSE
### (Privilege)

18.    Plaintiff's causes of action under California Labor Code Section 1102.5 are barred in whole or in part by the privilege set forth in California Civil Code Section 47.

## FIFTEENTH AFFIRMATIVE DEFENSE
### (Failure to Exhaust Administrative Remedies)

19.    Plaintiff is required to timely pursue and exhaust his administrative remedies against Defendant under the California Fair Employment and Housing Act (California Government Code sections 12900, *et seq.*).   While Plaintiff's Complaint alleges that he has exhausted such administrative remedies, his allegation is vague.  Therefore, to the extent Plaintiff failed to exhaust his administrative remedies under the California Fair Employment and Housing Act, his causes of action based on the California Fair Employment and Housing Act would be barred.   Investigation and discovery are ongoing, and Defendant reserves the right to assert additional failures to exhaust by Plaintiff if such is discovered or established.

## SIXTEENTH AFFIRMATIVE DEFENSE
### (Comparative Fault)

20.    Plaintiff is barred from any recovery against Defendant because the damages and injuries, if any, of which Plaintiff complains, were solely and proximately caused by the negligent or wrongful acts of Plaintiff or his agents.  In the event, however, that a finding is made that Defendant committed any negligent or wrongful acts and further that such negligent or wrongful acts contributed to Plaintiff's injuries or damages, if any, then Plaintiff's recovery, if any, should

ANSWER
74870-0029/LEGAL27900998.1

5

Exhibit C
Page 5 of 11

1  be reduced on the basis of Plaintiff's comparative fault that contributed to the alleged injuries or

2  damages or claims upon which Plaintiff seeks recovery.

3  ### SEVENTEENTH AFFIRMATIVE DEFENSE

4  ### (Laches, Estoppel, Waiver and Unclean Hands)

5      21.    Plaintiff's Complaint, and the whole thereof, is barred by the doctrines of laches,

6  estoppel, waiver and unclean hands.  Investigation and discovery are ongoing, and Defendant

7  reserves the right to assert and amend this affirmative defense as facts are discovered or

8  established.

9  ### EIGHTEENTH AFFIRMATIVE DEFENSE

10  ### (No Multiple Recovery)

11      22.    Plaintiff's Complaint and each purported claim and cause of action alleged therein

12  are barred in whole or in part to the extent that Plaintiff seeks a multiple recovery for the same

13  alleged wrongs.

14  ### NINETEENTH AFFIRMATIVE DEFENSE

15  ### (No Joint Employment)

16      23.    Defendant is neither an employer nor joint employer of Plaintiff.

17  ### TWENTIETH AFFIRMATIVE DEFENSE

18  ### (No Agency)

19      24.    Defendant is neither the agent nor the principal of any other defendant in this

20  action.

21  ### TWENTY-FIRST AFFIRMATIVE DEFENSE

22  ### (Contributory Negligence)

23      25.    Defendant denies that it was negligent in any way in connection with the conduct

24  alleged in Plaintiff's Complaint, but as to any and all acts of negligence alleged in the Complaint,

25  Defendant affirmatively alleges that Plaintiff's contributory negligence, incurred risk,

26  comparative fault and other fault caused the damages sought in this action, and therefore Plaintiff

27  cannot recover in this action or the damages should be diminished in proportion to the amount of

fault attributable to him.

ANSWER
74870-0029/LEGAL27900998.1

6

Exhibit C
Page 6 of 11

26. If Plaintiff suffered or sustained any loss, injury, damage or detriment, the same was directly and proximately caused and contributed to by the breach, conduct, acts, omissions, activities, carelessness, recklessness, negligence, and/or intentional misconduct of others, and not by Defendant.

### TWENTY-SECOND AFFIRMATIVE DEFENSE
#### (Assumption of Risk)

27. Defendant alleges that the Complaint, and each and every purported cause of action therein, is barred because Plaintiff incurred or assumed the risks of which he complains in this action.

### TWENTY-THIRD AFFIRMATIVE DEFENSE
#### (Joint and Several Liability)

28. Should Plaintiff prevail against Defendant, Defendant's liability is several and limited to its own actionable segment of fault, if any.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE
#### (Set Off)

29. To the extent Plaintiff has been compensated for the alleged damages by receiving payment from other persons or entities the amount of any such compensation should be set off against any recovery Plaintiff may receive in this action.

### TWENTY-FIFTH AFFIRMATIVE DEFENSE
#### (Intervening Acts)

30. The damages complained of may have been the result of the intervening actions of others and were not proximately caused by the actions or omissions of Defendant.

### TWENTY-SIXTH AFFIRMATIVE DEFENSE
#### (Apportionment)

31. Any non-physical or physical harm alleged can be attributed to several causes and the damages for this harm, if any, should be apportioned among the various causes according to the contribution of each cause to the harm sustained.

1

2

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

### (No Duty)

3    32.    Defendant owes no duty to Plaintiff to control the alleged conduct of third persons.

4

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

5

### (Labor Relations Management Act Preemption)

6    33.    Plaintiff's claims are preempted by federal law, including the Labor Relations

7    Management Act, Section 301.

8

## TWENTY-NINTH AFFIRMATIVE DEFENSE

9

### (At-Will Employment)

10    34.    Plaintiff's causes of action for breach of the covenant of good faith and fair

11    dealing fail because at all times during his employment with Defendant ATSI, Plaintiff's

12    employment was "at-will" and had no contract (written, verbal, express, implied or otherwise)

13    with Defendant. As such, Plaintiff's causes of action for breach of the covenant of good faith and

14    fair dealing are barred.

15

## THIRTIETH AFFIRMATIVE DEFENSE

16

### (Grievance and Arbitration)

17    35.    Plaintiff's causes of action are not actionable and are barred because any claims

18    are required to be adjudicated pursuant to the grievance and arbitration provisions of the

19    collective bargaining agreement between Defendant ATSI and the Union representing Plaintiff.

20

## THIRTY-FIRST AFFIRMATIVE DEFENSE

21

### (Internal Grievance Procedure)

22    36.    Plaintiff's Complaint and each purported claim and cause of action alleged therein

23    are barred in whole or in part because Plaintiff did not use Defendant ATSI's internal grievance

24    procedures.

25

26

27

ANSWER
74870-0029/LEGAL27900998.1

8

Exhibit C
Page 8 of 11

## THIRTY-SECOND AFFIRMATIVE DEFENSE

### (Alaska Native Corporation Preemption)

37.     Plaintiff's Complaint and each purported claim and cause of action alleged therein are barred because any and all state law claims against Defendant are preempted as Defendant ATSI is an Alaska Native Corporation.

## THIRTY-THIRD AFFIRMATIVE DEFENSE

### (Reservation of Right to Amend Answer)

38.     The Complaint and all allegations therein are vague, uncertain and indefinite, and therefore Defendant presently has insufficient knowledge or information as to whether it may have additional and as yet unstated and unknown defenses or affirmative defenses.  Defendant reserves the right to assert additional defenses and affirmative defenses in the event that further discovery, investigation and/or analysis reveals that such defenses are appropriate and available to Defendant.

## THIRTY-FOURTH AFFIRMATIVE DEFENSE

### (LMRA Preemption)

39.     Plaintiff's employment was governed by a collective bargaining agreement, and his state law claims are preempted by the Labor Management Relations Act.

## PRAYER FOR RELIEF

WHEREFORE, Defendant Ahtna Technical Services, Inc. requests entry of judgment in its favor on Plaintiff's Complaint and prays:

1.  That Plaintiff Jose Galvan take nothing by his Complaint;

2.  That judgment be entered in favor of Defendant Ahtna Technical Services, Inc;

3.  That Defendant Ahtna Technical Services, Inc. recover its attorney fees, costs and expenses incurred herein; and

4.  For such other and further relief as the Court deems just and proper

ANSWER
74870-0029/LEGAL27900998.1

9

Exhibit C
Page 9 of 11

1

2    DATED: September _23_, 2013.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**PERKINS COIE** LLP

By: _____
      Sarah Jane Fischer, Bar No. 260807
      SarahFischer@perkinscoie.com

Attorneys for Defendants
Ahtna Technical Services, Inc.

ANSWER
74870-0029/LEGAL27900998.1

10

Exhibit C
Page 10 of 11

1

## PROOF OF SERVICE BY MAIL

2

3
     I am a citizen of the United States and employed in Anchorage, Alaska. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 1029 West Third Ave., Suite 300, Anchorage, Alaska 99501. On ___Sept. 23___, 2013, I sent via U.S. Mail a true and correct copy of the foregoing document to:

4

5

Adrian Cress

6
Cress Law Firm
2425 Fifth Avenue, Suite 330

7
San Diego, California 92101

8
*Attorney for Plaintiff*

9
     I declare under penalty of perjury under the laws of the State of Alaska that the above is true and correct.

10

11
    Executed on ___Sept. 23___, 2013, at Anchorage, Alaska.

12

13
                      Marcie Craig

14

15

16

17

18

19

20

21

22

23

24

25

26

27

ANSWER
74870-0029/LEGAL27900998.1

11

Exhibit C
Page 11 of 11